**AFFIDAVIT**

I, KYLE J. MORI, being duly sworn, declare and state as follows:

## I. INTRODUCTION

1.      I am a Supervisory Special Agent with the United States Department of Justice, Drug Enforcement Administration ("DEA"). I am currently assigned to the Los Angeles Field Division ("LAFD"). At the LAFD, I am assigned to supervise the Organized Crime Drug Enforcement Task Force ("OCDETF") Strike Force and I am the lead case agent on the investigation discussed in this affidavit. As such, I am an "investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.      Prior to becoming a DEA Special Agent, I was a deputized Task Force Officer with the DEA. I have worked for the DEA since approximately October 2008. Prior to becoming a DEA Special Agent, I was employed as a sworn law enforcement officer in the state of California since approximately June 2001.

3.      I have received training and have experience investigating violations of federal narcotics and money laundering laws, including but not limited to, Title 21, United States Code, Sections 841, 846, 952, 959 and 963, and Title 18, United States Code, Section 1956(a).  I have been involved in various electronic surveillance methods, the debriefing of defendants, informants and witnesses, as well as others who have knowledge of the manufacturing, distribution, transportation, storage and importation of controlled substances and the laundering of drug proceeds.  Prior to becoming a DEA Special Agent, I attended an 18-week Basic Agent

1

Academy at the DEA Training Academy in Quantico, Virginia. I have also attended the police academy in California.

4. Throughout my law enforcement career, I have investigated individuals and criminal organizations which have represented a significant threat to public safety and national security. Specifically, during the course of my employment, I have received comprehensive, formalized instruction to include such topics as drug identification, money laundering techniques, patterns of drug trafficking, complex conspiracies, the exploitation of narcotics traffickers' telecommunications devices, criminal law, surveillance, and other investigative techniques. I have participated in numerous investigations into the unlawful importation, manufacture, possession with intent to distribute, and distribution of narcotics and controlled substances, the laundering of narcotics proceeds, and conspiracies associated with narcotics offenses. In conducting these investigations, I have utilized a variety of investigative techniques and resources, including but not limited to, surveillance, confidential source debriefings, telephone toll analysis, as well as wire and electronic communication analysis in federal and California State wiretap investigations.

5. I have participated in many aspects of drug investigations, including investigations into the smuggling of illegal drugs, money laundering, and extortion related to drug trafficking. I am familiar with narcotics traffickers' methods of operation, including the manufacturing, storage, transportation, and distribution of narcotics, the collection of money that represents the proceeds of narcotics trafficking, and money laundering. I am also familiar with the manner in which narcotics traffickers transport and distribute narcotics in areas they control.

## II.   PURPOSE OF AFFIDAVIT

6.   This affidavit is made in support of a criminal complaint and arrest warrant for Cristian Fernando GUTIERREZ-OCHOA[1] ("GUTIERREZ-OCHOA"), for conspiring to distribute five (5) kilograms or more of a mixture or substance containing a detectable amount of cocaine and five hundred (500) grams or more of a mixture or substance containing a detectable amount of methamphetamine, Schedule II controlled substances, knowing, intending, and having reasonable cause to believe that such substances would be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a), 960(b)(1)(B), and 960(b)(1)(H); all in violation of 21 U.S.C. § 963; and conspiring to launder monetary instruments, in violation of 18 U.S.C. § 1956(a) and (h).

7.   It is unlawful "to manufacture or distribute a controlled substance in schedule I or II . . . intending, knowing, or having reasonable cause to believe that such substance . . . will be unlawfully imported into the United States or into waters within a distance of 12 miles of the coast of the United States." 21 U.S.C. § 959(a).  Pursuant to 21 U.S.C. § 963, "any person who attempts or conspires to commit any offense defined in this subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."  Additionally, 21 U.S.C. § 959(c), establishes that Section 959 is "intended to reach acts of manufacture or distribution committed outside the territorial jurisdiction of the United States."

8.   It is unlawful "to conduct or attempt[] to conduct … a financial transaction which in fact involves the proceeds of specified unlawful activity" "knowing that the property involved

---

[1] Some documents obtained during this investigation have spelled GUTIERREZ-OCHOA's first name as "Christian" which is also the common English language spelling for his first name.

in a financial transaction represents the proceeds of some form of unlawful activity" and "knowing that the transaction is designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a). Pursuant to 18 U.S.C. § 1956(h), "any person who conspires to commit any offense defined in this section … shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy."

9. Pursuant to 18 U.S.C. § 3238, there is statutory venue for "all offenses begun or committed … out of the jurisdiction of any particular State or district … in the district in which … any one of two or more joint offenders is arrested or is first brought." As will be described in more detail below, multiple joint offenders have already been first brought to the District of Columbia, where they have been convicted for their involvement in the drug trafficking and money laundering conspiracy in which GUTIERREZ-OCHOA is a member. *See, e.g., United States v. Ruben Oseguera Gonzalez,* 1:16-CR-00229 (D.D.C.).

6. The facts set forth in this affidavit are based upon your Affiant's personal observations, training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. STATEMENT OF PROBABLE CAUSE

A. **Summary of Investigation**

7. Since approximately 2012 in the United States and elsewhere, the DEA has been investigating the drug trafficking and money laundering activities of a violent transnational drug

trafficking organization operating out of Jalisco, Mexico, named the New Generation Cartel of Jalisco, or the CJNG (hereinafter "CJNG").  The investigation has revealed that the CJNG has evolved into one of the most prominent and powerful criminal organizations in Mexico with a substantial influence over the drug trafficking routes into, and distribution within, the United States.  The investigation has revealed, based on intercepted electronic communications and witness debriefings, that the CJNG primarily traffics in fentanyl, precursor chemicals, cocaine, and methamphetamine.

8. Based on federally authorized electronic wire intercepts and interviews with dozens of witnesses, your Affiant has learned that the undisputed leader of the CJNG is Nemesio Ruben OSEGUERA-CERVANTES, also known by his alias "EL MENCHO." In 2014, EL MENCHO was indicted in the District Court for the District of Columbia for his participation in a Continuing Criminal Enterprise, 1:14-cr-00051.  EL MENCHO is a fugitive in Mexico.  The investigation has also led to the indictment and conviction of multiple other individuals in the District of Columbia for their participation in the CJNG's drug trafficking and money laundering conspiracy.  *See, e.g., United States v. Ruben Oseguera Gonzalez*, 1:16-CR-00229; *United States v. Gerardo Gonzalez Valencia and Jose Gonzalez Valencia*, 1:16-CR-00065; *United States v. Juan Manual Abouzaid El Bayeh*, 1:17-CR-00094; *United States v. Javier Algredo Vazquez*, 1:21-CR-00597.

9. The investigation revealed that EL MENCHO's daughter is married to or in a romantic relationship with GUTIERREZ-OCHOA.

### B. Identification of GUTIERREZ-OCHOA

10. In October 2024, the DEA in Los Angeles learned that the Department of Homeland Security (hereinafter "DHS") in California received an Interpol "Red Notice"[2] seeking the detention of GUTIERREZ-OCHOA. The Red Notice was issued by the Government of Mexico (hereinafter "GOM"). DHS compared known photographs of GUTIERREZ-OCHOA and found they closely matched that of a man residing in California named Miguel Luis MARTINEZ.

11. DHS utilized facial recognition software and found that GUTIERREZ-OCHOA and MARTINEZ were the same person and GUTIERREZ-OCHOA had assumed a fictitious identity under the name Luis Miguel MARTINEZ.

12. Law enforcement databases revealed that on September 8, 2023, MARTINEZ utilized a Social Security number to apply for a California driver license. MARTINEZ had neither a driver license nor identification card prior to September 2023.

13. Your Affiant reviewed a credit report for MARTINEZ and found his social security number was issued in 1992 and is being utilized by a separate, third-person. Based on your Affiant's training and experience, your Affiant knows this is common for persons committing identity theft and/or assuming a fake identity.

14. Your Affiant reviewed several law enforcement databases related to MARTINEZ and found that he had no records of existence between 1992 when the social security number was issued and September 2023. Your Affiant located no birth certificate or immigration or naturalization records for MARTINEZ. These items are of note because it is suspicious that no

---

[2] An Interpol "Red Notice" is a worldwide law enforcement alert to locate and provisionally arrest a person pending extradition to the country where the person is a fugitive from justice.

records exist indicating that MARTINEZ existed in the United States for a period of more than 30 years. Your Affiant knows, based on training and experience, that this is common with immigration fraud when persons obtain a fictitious name to reside or enter the United States illegally.

15. Your Affiant reviewed a photograph of MARTINEZ and GUTIERREZ-OCHOA. Your Affiant agrees with the DHS facial recognition that MARTINEZ and GUTIERREZ-OCHOA are the same person.

      C.      **Government of Mexico Investigation**

16. Your Affiant reviewed an arrest warrant and the Interpol Red Notice obtained from the GOM. The arrest warrant states, in summary, that on November 29, 2021, the GOM obtained an arrest warrant for GUTIERREZ-OCHOA for the crimes of organized crime, detaining a hostage, and kidnapping. Based on this arrest warrant, on September 1, 2022, GOM issued an Interpol Red Notice seeking the detention of GUTIERREZ-OCHOA. The Red Notice listed "United States" as a travel destination for GUTIERREZ-OCHOA.

17. The Red Notice, in providing a summary of the GOM investigation, indicated that in November 2021, GUTIERREZ-OCHOA kidnapped two members of the Mexican Navy and held them hostage in an attempt to secure the release of EL MENCHO's wife (GUTIERREZ-OCHOA's mother-in-law), who had been arrested sometime earlier. The Red Notice identified GUTIERREZ-OCHOA as a leader of the CJNG.[3] The Red Notice and GOM investigation noted that GUTIERREZ-OCHOA's nickname is "GUACHO."

18. In 2024, a DEA confidential source (hereinafter "CS-1") reported that GUTIERREZ-OCHOA went missing in Mexico in December 2023. CS-1 reported that EL

---

[3] Your Affiant contacted Interpol on or about October 24, 2024, and verified that the Red Notice is valid and remains in Interpol holdings.

MENCHO murdered his son-in-law, GUTIERREZ-OCHOA, for lying. CS-1 stated that GUTIERREZ-OCHOA utilizes the moniker "LA PALOMO."

19. Based on the totality of the information learned during the investigation and set forth in this affidavit, your Affiant believes GUTIERREZ-OCHOA faked his death in Mexico, illegally escaped to the United States to evade capture for the arrest warrant in Mexico, and is hiding in Riverside, California, under the fake name Luis Miguel MARTINEZ.

### D. Money Laundering Activities in United States

20. Surveillance and law enforcement records indicate that GUTIERREZ-OCHOA is residing in a luxury residence in an exclusive neighborhood of Riverside, California (hereinafter "Riverside Residence").

21. Using administrative subpoenas and law enforcement databases, your Affiant found that the Riverside Residence was purchased for $1.2 million in a cash purchase in 2023 – around the time GUTIERREZ-OCHOA disappeared in Mexico and assumed the identity of MARTINEZ in the United States.

22. Escrow and law enforcement records indicate that the Riverside Residence was purchased by a company named Pasion Azul, S.A. de C.V. (hereinafter "Pasion Azul"), a purported tequila manufacturer located in Jalisco, Mexico. To date, the Riverside Residence is titled to Pasion Azul.

23. As part of the investigation, your Affiant interviewed the escrow agent, real estate agent, and seller of the Riverside Residence. Each of these persons independently stated that the circumstances involving the purchase of the Riverside Residence was "suspicious." The prior owner of the Riverside Residence said she believed the purchasers were "drug dealers" from Mexico. The real estate agent representing the seller told agents that the purchasing agent

utilized a titling company to "pre-approve" the titling of the Riverside Residence to Pasion Azul. The real estate agent representing the seller said this is highly suspicious and uncommon in the real estate and titling industry.

24. The prior owner of the Riverside Residence provided still-photographs of video surveillance footage at the home from the time period that the Riverside Residence was sold to Pasion Azul. The video depicts GUTIERREZ-OCHOA arriving at the Riverside Residence on the day the Riverside Residence was to be shown to representatives from Pasion Azul, just prior to the sale of the Riverside Residence. Your Affiant has reviewed the still-photographs and concurs that GUTIERREZ-OCHOA was captured on video surveillance at the Riverside Residence at the time of the sale of the home.

25. Agents conducted an opensource query of Pasion Azul and found it to be located in Jalisco, Mexico. Based on your Affiant's knowledge of this investigation, Jalisco is the Mexican state which houses the headquarters of the CJNG.

26. Records obtained through the Public Registry of Commerce for the GOM name a person as the sole administrator of Pasion Azul and another individual as having power of attorney. According to the documents, approximately five other unnamed Mexican nationals are listed as principals for the company.[4]

27. DEA agents conducted multiple inquiries to the patent and trademark administration for the GOM. Pasion Azul applied for a trademark on February 15, 2023, and was approved on June 6, 2023. Of note, a third individual (neither the sole administrator nor the person having power of attorney) applied for the trademark and utilized a "Hotmail" email address.

---

[4] DEA agents assigned to this investigation know the identities of these persons but are not listing their names in this affidavit due to the nature of the ongoing investigation.

28. Agents found that the sole administrator of Pasion Azul possessed approximately 53 trademarks, most of which are associated with alcohol, tequila, or other alcoholic beverage brands.

29. Your Affiant believes Pasion Azul is a money laundering front for the CJNG and Pasion Azul was created and utilized in part to purchase the Riverside Residence for use by GUTIERREZ-OCHOA and give the appearance that the purchase was legitimate. Your Affiant makes this assertion based on the following:

   a) The trademark for Pasion Azul was granted during the same timeframe that the Riverside Residence was initially listed for sale, during the summer of 2023.

   b) The number of trademarks and associated persons listed in the GOM files gives the impression that Pasion Azul and related trademark brands is a confusing web of persons meant to intentionally confuse law enforcement that may investigate the company.

   c) In order to purchase a $1.2 million residence with cash, Pasion Azul would need enough liquid assets, capital, or cash on hand to purchase the residence. Having the ability to purchase a $1.2 million residence would indicate that the company has a valuation well over the purchase price of the Riverside Residence.

   d) Multiple and various email addresses are utilized in documents relating to various trademarks, including public email addresses such as "Hotmail." In organizing and operating a million-dollar business, utilizing the same email or at least utilizing a professional email associated with the business would allow the consumer to recognize the brand as being legitimate, organized, and well-

|   |   |
|---|---|
|   | managed as opposed to the various, publicly created emails utilized by Pasion Azul and the other trademarked companies. |
| e) | The legal representative for Pasion Azul in the GOM files and legal representative for the purchase of the Riverside Residence are separate Mexican nationals, despite the fact that the Riverside Residence is titled to Pasion Azul. |
| f) | Based on your Affiant's training and experience and the investigation, there is no legitimate business reason for a Mexican tequila company to purchase a luxury home in Riverside, California. The home is located more than 100 miles from the Mexican border and approximately 65 miles from Los Angeles. |
| g) | Your Affiant also learned that GUTIERREZ-OCHOA's wife, the daughter of EL MENCHO, opened and apparently operates a coffee shop less than 20 miles from the Riverside Residence. It appears as though GUTIERREZ-OCHOA fled Mexico to reside with or near his wife in Riverside. GUTIERREZ-OCHOA's wife is a United States citizen. |

### E.     Surveillance at Riverside Home

30.     DEA agents conducted surveillance at the Riverside Residence and observed GUTIERREZ-OCHOA exiting the front door and several times observed a vehicle registered to MARTINEZ parked in the driveway. Agents have also observed luxury cars including a BMW and another car with Mexican license plates[5] frequently parked at the Riverside Residence.

---

[5] The Riverside Residence is located more than 100 miles from the United States/Mexico border. It is uncommon to observe cars with Mexican license plates this far into the interior of the United States.

31. During surveillance on one such occasion, DEA agents attempted to conduct mobile surveillance of GUTIERREZ-OCHOA, but were unable to do so because of suspicious behavior and counter-surveillance techniques utilized by him.

32. During surveillance, agents observed GUTIERREZ-OCHOA exit the Riverside Residence and immediately start looking up and down the street. Agents observed GUTIERREZ-OCHOA enter a car that was registered to MARTINEZ and depart. Immediately, GUTIERREZ-OCHOA started to utilize counter-surveillance techniques.

33. Based on my training and experience, your Affiant knows that counter-surveillance is a technique utilized by persons engaged in criminal activity to mask their activities and/or determine if they are being followed by law enforcement. Persons conducting counter-surveillance are nearly impossible to follow for long periods of time. GUTIERREZ-OCHOA was conducting counter-surveillance, as evidenced by his movements described below.

  a) DEA agents observed GUTIERREZ-OCHOA depart Riverside Residence, driving northbound on Dauchy Avenue, Westbound onto Cactus Avenue, Northbound onto Crystal View Terrace, Westbound onto Overlook Parkway, and Northbound onto Washington Street. Upon reaching the intersection of Washington Street and Victoria Avenue, GUTIERREZ-OCHOA made an eastbound turn onto Victoria Avenue and then immediately set up for a Northbound turn onto Mary Street.

  b) GUTIERREZ-OCHOA instead made a U-turn and began travelling westbound on Victoria Avenue (indicative of counter-surveillance). Upon reaching the Victoria Avenue and Adams Street intersection, GUTIERREZ-OCHOA made a Northbound turn onto Adams Street. GUTIERREZ-OCHOA then turned into a

        BMW car dealership. Once entering the dealership, GUTIERREZ-OCHOA drove through the lot and ultimately pulled back onto Adams Street.

c)     GUTIERREZ-OCHOA then turned into a Honda car dealership a short distance away. Realizing that GUTIERREZ-OCHOA was conducting counter-surveillance and not wanting to further alert GUTIERREZ-OCHOA to the surveillance, DEA agents terminated the surveillance operation.

d)     After terminating the surveillance, agents began driving to a pre-determined meet location to discuss the surveillance. Upon arriving at the pre-determined meet location, one of the agents participating in surveillance, Special Agent ("SA") Audrey Alaniz, realized that GUTIERREZ-OCHOA was in the same parking lot as the DEA agents and had apparently followed the agents. Agents observed GUTIERREZ-OCHOA in a parking spot, watching SA Alaniz in his rear-view mirror.

e)     In order to determine if GUTIERREZ-OCHOA had followed the agents or if this was a coincidence, all of the agents departed the parking lot in different directions. Upon departing, GUTIERREZ-OCHOA followed SA Alaniz. SA Alaniz conducted multiple turns and lane changes to evade GUTIERREZ-OCHOA, however, GUTIERREZ-OCHOA continued to follow SA Alaniz.

f)     Ultimately, after driving eastbound on Highway 91 for a short time, SA Brent Ramos pulled alongside GUTIERREZ-OCHOA in order to prevent GUTIERREZ-OCHOA from changing lanes with SA Alaniz while she was trying to maneuver away from GUTIERREZ-OCHOA. Immediately after, GUTIERREZ-OCHOA exited Highway 91 in Riverside, California.

34. GUTIERREZ-OCHOA was clearly conducting counter-surveillance from the time he departed the Riverside Residence. His actions were, based on your Affiant's training and experience, indicative of a person involved in criminal activity and attempting to evade law enforcement detection.

### F. Statements from CS-2

35. DEA agents interviewed CS-2[6] in relationship to the investigation. CS-2 stated the following, in summary.

36. CS-2 is a former member of the CJNG in Mexico. CS-2 is familiar with several tequila companies, including Pasion Azul, Agave Azul, and Tequila Azul that are owned and managed by EL MENCHO to launder drug proceeds in Mexico. CS-2 stated that EL MENCHO and the CJNG utilize multiple fictitious or "front" tequila or alcohol brands to launder drug proceeds.

37. In 2010 or 2011, as part of his/her work with the CJNG, CS-2 was tasked with scouting land in order to identify the best area in Mexico to grow agave[7] for Pasion Azul and other tequila companies. CS-2 stated that EL MENCHO utilized extortion and violence to force competitor tequila companies out of the immediate area of Pasion Azul in Jalisco, Mexico. CS-2 stated these companies were utilized by EL MENCHO and CJNG to launder drug proceeds and give the appearance that the money EL MENCHO and his co-conspirators were making was legitimate.

---

[6] CS-2 is cooperating with the DEA in exchange for both monetary and immigration benefits. CS-2 has testified credibly at trial in federal court and provided information to the DEA for several years. CS-2 has never been known to lie or mislead handling agents.

[7] Agave is a grown ingredient that is vital to the production of tequila and associated liquors in Mexico.

38. CS-2 stated he knew GUTIERREZ-OCHOA and his father, Jose Luis Gutierrez-Valencia (hereinafter referred to by his known alias, "DON CHELO").

39. CS-2 positively identified a photograph depicting GUTIERREZ-OCHOA and stated he/she participated in multiple in-person meetings with GUTIERREZ-OCHOA in Mexico. CS-2 and GUTIERREZ-OCHOA also participated in the trafficking and distribution of shipments of cocaine and methamphetamine that were destined for the United States. CS-2 stated GUTIERREZ-OCHOA is married to EL MENCHO's youngest daughter. CS-2 participated in five drug shipments directly with GUTIERREZ-OCHOA.

40. CS-2 first met GUTIERREZ-OCHOA in early 2014. CS-2 and GUTIERREZ-OCHOA were introduced by GUTIERREZ-OCHOA's brother. At the time, CS-2 was operating drug stash warehouses in Mexico for EL MENCHO and the CJNG, and he/she was assisting GUTIERREZ-OCHOA's brother with methamphetamine shipments in Mexico. CS-2 knew GUTIERREZ-OCHOA was responsible for driving EL MENCHO's methamphetamine between clandestine laboratories and stash locations in Mexico where the methamphetamine was being produced and stored. GUTIERREZ-OCHOA and his brother were responsible for the safe passage of methamphetamine within Mexico. CS-2 said the methamphetamine that GUTIERREZ-OCHOA was trafficking was destined to be imported into the United States and resold. CS-2 personally knew of and participated in four methamphetamine shipments in which GUTIERREZ-OCHOA also participated. CS-2 stated GUTIERREZ-OCHOA transported approximately 40,000 kilograms of methamphetamine during the time they worked together.

41. CS-2 said GUTIERREZ-OCHOA did not want to be involved in methamphetamine shipments in more remote areas of Mexico because GUTIERREZ-OCHOA preferred to live in Guadalajara, a larger city in Mexico.

42. In March 2015, CS-2 recalled that DON CHELO was incarcerated in Mexico. CS-2 was at a meeting in Mexico with multiple CJNG members. Because of DON CHELO's incarceration, GUTIERREZ-OCHOA was running drug trafficking activities in his absence. At a meeting, EL MENCHO instructed CS-2 to meet with GUTIERREZ-OCHOA so that CS-2 could provide security for a large cocaine shipment being coordinated by GUTIERREZ-OCHOA. The cocaine shipment was traveling through an area of Mexico controlled by CS-2. The cocaine shipment was being transported in two cargo vans, and according to CS-2, contained two tons of cocaine. Other co-conspirators informed CS-2 that the cocaine shipment arrived from a port in Mexico and it was destined for Guadalajara. CS-2 escorted GUTIERREZ-OCHOA and the cocaine shipment through CS-2's territory of Mexico and ensured the safe passage of the cocaine. CS-2 stated this cocaine shipment, organized by GUTIERREZ-OCHOA, was destined for the United States.

### G. Electronic Intercept Investigation

43. The DEA's investigation into the CJNG utilized the electronic interception of more than 30 devices utilized by CJNG members in Mexico and elsewhere. Starting in 2013, the Honorable Josephine Staton Tucker, United States District Judge for the Central District of California, authorized the interception of electronic communications sent over BlackBerry Messenger (BBM). Below are some examples of intercepted electronic communications related to GUTIERREZ-OCHOA.

44. On June 21, 2013, agents intercepted an electronic communication between Abigael GONZALEZ-VALENCIA[8] (hereinafter "GONZALEZ-VALENCIA") and an

---

[8] GONZALEZ-VALENCIA has been identified as a member of the leadership of the CJNG. He is the brother-in-law of EL MENCHO and was indicted in 2014 in the District Court for the District of Columbia, along with EL MENCHO, for his involvement in a continuing

*(footnote cont'd on next page)*

unidentified person (hereinafter "U-1"). During the conversation, U-1 asks GONZALEZ-VALENCIA for help paying a debt and proposes that GONZALEZ-VALENCIA take a car for collateral to satisfy the debt. GONZALEZ-VALENCIA responds "first let's deliver those 3…I've fallen behind for a while because of you."[9] Later, U-1 states "including the problem I have because of what Palomo went to make mess after I sold everything." Your Affiant believes based on his training, experience, and knowledge of the investigation that GONZALEZ-VALENCIA and U-1 are discussing a drug debt that is owed to GONZALEZ-VALENCIA. GONZALEZ-VALENCIA appears displeased with U-1 about the expediency in which the debt is being satisfied. During the conversation, GONZALEZ-VALENCIA instructs U-1 to deliver three units of drugs. Later, U-1 blames at least part of the problem with the drug debt on "Palomo," or GUTIERREZ-OCHOA, but indicates he had delivered the drugs.

45. On July 11, 2013, agents intercepted an electronic communication between GONZALEZ-VALENCIA and an unidentified person (hereinafter "U-2"). During the conversation, U-2 states "…over there we don't pay for the entrance." GONZALEZ-VALENCIA states "we do them better here." U-2 replies "it was made in the product that Palomo liked…" Your Affiant believes based on his training, experience, and knowledge of the investigation that U-2 and GONZALEZ-VALENCIA are discussing methamphetamine trafficking in the United States. When U-2 references paying for the "entrance" he is referring to the transportation cost associated with transporting drugs to the United States. GONZALEZ-VALENCIA references they can "do them better here." Your affiants believes GONZALEZ-

---

criminal enterprise, 1:14-cr-00051. GONZALEZ-VALENCIA was captured in Mexico and is imprisoned awaiting extradition to the United States.

[9] The intercepted communications were primarily in Spanish. The intercepted communications included in this affidavit are English translations of the original Spanish communications.

17

VALENCIA is discussing the manufacture of methamphetamine in Mexico prior to transportation to the United States. When U-2 replies about the "product" that "Palomo" likes, U-2 is referring to the methamphetamine that Palomo (GUTIERREZ-OCHOA) prefers to traffic.

46.     On November 2, 2013, agents intercepted an electronic communication between EL MENCHO and an unidentified person (hereinafter "U-3"). During the conversation, U-3 and EL MENCHO are discussing territory in Mexico. U-3 asks EL MENCHO if "they took away Atemajac from me."[10] EL MENCHO responds that he spoke with "GUACHO" and "he" had not taken anything from U-3. U-3 replied that the "territory is still mine." At the end of the conversation, EL MENCHO says "I'll check that [*sic.*] on that son, Guacho is here my friend." U-3 replies "Yes, Guacho just told me." Your Affiant believes based on his training, experience, and knowledge of the investigation that U-3 and EL MENCHO are discussing drug territory in Mexico related to the CJNG. During the conversation, EL MENCHO, the leader of the CJNG, is delegating an important decision about the cartel's territory to GUTIERREZ-OCHOA, whom he refers to by his moniker, GUACHO.

47.     As indicated in this affidavit, GUTIERREZ-OCHOA utilizes the monikers GUACHO and LA PALOMO. Your Affiant knows that drug traffickers frequently utilize monikers instead of their given name to evade detection by law enforcement and rival cartel members. In the aforementioned electronic intercepts, your Affiant believes references to GUACHO and LA PALOMO are referring to GUTIERREZ-OCHOA.

### IV. CONCLUSION

48.     For all the reasons described above, and based on my training and experience as a DEA Supervisory Special Agent, there is probable cause to believe that GUTIERREZ-OCHOA

---

[10] Atemajac de Brizuela is a municipality in the state of Jalisco, Mexico.

has committed a violation of 21 U.S.C. § 959, 960, and 963 (conspiracy to distribute controlled substances for importation into the United States), and 18 U.S.C. § 1956 (money laundering).

_____
KYLE J. MORI
Supervisory Special Agent
Drug Enforcement Administration

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on November 6, 2024.

_____
HONORABLE MOXILA A. UPADHYAYA
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF COLUMBIA