**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| |  |
|---|---|
| UNITED STATES<br><br>v.<br><br>CRISTIAN FERNANDO GUTIERREZ-OCHOA,<br><br>          Defendant. | Criminal Action No. 25-035 (BAH)<br><br>Judge Beryl A. Howell |

**MEMORANDUM OPINION**

Petitioners, calling themselves the "American Victims of Cartel Terrorism" ("AVCT"), are twenty-two family members, legal guardians, and legal representatives of the victims of a November 4, 2019, massacre in Mexico by the Juárez Cartel.  *See* Third-Party AVCT Ancillary Pet. ("Pet.") at 1, 3, ECF No. 57.  After prevailing in a lawsuit in another district and obtaining, in 2022, a judgment totaling over four-billion dollars against this Cartel ("2022 Judgment"), they registered the judgment in this District in September 2023, and now seek partial satisfaction of this judgment by attaching and executing on the assets identified and forfeited by the government as part of the criminal case against defendant Cristian Fernando Gutierrez-Ochoa.  *See* Pet. at 3.

Defendant, an admitted member of the Cártel de Jalisco Nueva Generación ("CJNG"), pleaded guilty, in June 2025, to laundering the proceeds from CJNG's narcotics trafficking operations and, as part of his plea agreement, agreed to a preliminary order of forfeiture of various assets, including over $2,250,000 in U.S. currency seized from defendant's residence in November 2024, three vehicles, assorted personal property, such as artwork, luxury apparel and other personal items, and real property in Riverside, California, where defendant resided ("Forfeited Assets").  Consent Prelim. Order of Forfeiture ("POF") at 1-2, ECF 40; *see* Change of Plea Hr'g (June 20,

1

2025) Tr. ("Plea Tr.") at 22:11-14, 24:9-13, ECF No. 41; Jt. Statement of Stipulated Facts ("Stip. Facts") ¶ 2, ECF No. 36; Plea Agreement ¶ 5, ECF No. 35.[1]

Several months after defendant's plea hearing and before the scheduled sentencing hearing, petitioners filed, in November 2025, an ancillary petition in this criminal case to attach, in aid of partial execution of petitioners' 2022 Judgment, the Forfeited Assets identified in the preliminary order of forfeiture to which defendant consented. *See* Pet. at 5-7.[2]  Petitioners contend that they may attach the Forfeited Assets based on what the government describes as a "novel approach," Gov't's Mot. to Dismiss Ancillary Pet. ("Gov't's Mot.") at 27, ECF No. 64, to invoking Section 201(a) of the Terrorism Risk Insurance Act of 2002 ("TRIA"), Pub. L. No. 107-297, 116 Stat. 2322, 2337 (codified at 28 U.S.C. § 1610 note).  Undeterred by rejection of some of their same arguments in another court, *see United States v. Sun*, No. 21-cr-343, 2025 WL 1591868 (S.D.N.Y. June 5, 2025), and apparently "hav[ing] filed thousands of claims in forfeiture proceedings across the country," Gov't's Reply in Supp. of Its Mot. to Dismiss ("Gov't's Reply") at 3 n.3, ECF No. 72, petitioners characterize this case as a "bellwether test" of their legal theory, Pet. at 2.

Specifically, petitioners urge that TRIA § 201(a) be construed broadly as granting "American victims of cartel terrorism . . . the right, in every case, notwithstanding any other provision of law, to enforce their judgments 'against any assets available in the U.S.'"  Pet. at 2 (quoting 148 CONG. REC. S11528 (daily ed. Nov. 19, 2002) (statement of Sen. Tom Harkin)).

---

[1]     Also forfeited were "[t]wo firearms" recovered from defendant's residence, but those are not part of the Forfeited Assets that petitioners seek to attach. *See* Pet. at 7 n.26.

[2]     Three days after filing the ancillary petition in this criminal case, an overlapping, but not identical, group of petitioners filed a notice of application to attach defendant's Forfeited Assets in a miscellaneous docket originally created in 2023 for registration in this District of the $4,641,337,011 2022 Judgment against the Juárez Cartel. *See* Pls.' Mot. for Order Seeking On Notice Appl. for an Attach., *Miller v. Juárez Cartel*, No. 23-mc-95 (BAH), ECF No. 3.  The group filing the attachment notice in the miscellaneous docket consists of fifty-five persons affected by November 4, 2019, attack in Mexico, or their representatives, whereas petitioners filing the ancillary petition in this criminal case appear to represent a subset of these individuals. *See* Pet. at 16-37.  No explanation for this difference in petitioners between the two actions is provided in the record.

Characterizing petitioners' legal theory an "an overreach unsupported by statute or precedent," Gov't's Reply at 1, the government now moves to dismiss the ancillary petition, *see* Gov't's Mot.

For reasons explained below, the government's motion to dismiss the ancillary petition is granted.

## I.    BACKGROUND

The events leading to petitioners' 2022 Judgment, which they seek to enforce through attachment of the Forfeited Assets, are described below, followed by review of the factual and procedural history of the criminal case against defendant in the instant case.

### A.    Petitioners in Group Calling Itself "The American Victims of Cartel Terrorism"

"On November 4, 2019, members of the Juárez Cartel . . . and its violent armed wing, La Línea . . . , ambushed three women and fourteen children, murdering six of the children and their mothers in the Sierra Alta in Sonora, Mexico." *Miller v. Cartel*, No. 20-cv-132, 2022 WL 2286952, at *1 (D.N.D. June 24, 2022). "All of the people ambushed were United States citizens." *Id.*

The day before this ambush, on November 3, 2019, about 100 armed individuals met "at the ranch belonging to the leader of the criminal organization known as La Línea or the Juárez Cartel." *Id.* at *3 (citation omitted). The Juárez Cartel sought "to take back the territory of Agua Priesta which at the time belonged to the Sinaloa Cartel." *Id.* (citation omitted). The men divided into two groups, one of which placed itself "in two strategic points" coinciding with the two locations of the attacks the next day, and "the order was given to shoot . . . at anyone, be it a civilian, police officer, just anyone." *Id.* (citation omitted, alterations accepted, and ellipses in original).

On November 4, 2019, Maria Rhonita LeBaron, Christina Marie Langford, and Dawna Ray "and their children created a three-car caravan to travel the road from La Mora to their separate destinations." *Id.* "Rhonita and four of her children were traveling to Phoenix, Arizona to pick up her husband, Howard Miller, at the airport." *Id.* Christina Langford and her seven-month-old daughter "planned to accompany Rhonita LeBaron to the main highway and then head to Colonia LeBaron in Chihuahua, Mexico to meet her husband Tyler Johnson and their five other children" where they would depart "the following day and begin their family's permanent move back to North Dakota." *Id.* Dawna Ray and nine of her children "planned to accompany Rhonita to the main highway and then split off to attend a family wedding in Colonia LeBaron." *Id.* "Soon after departing, Rhonita's vehicle broke down," so "Dawna helped get Rhonita and her children back to La Mora, but Christina continued driving." *Id.* "After dropping Rhonita and the children back at La Mora, Dawna and her children got back on the road to continue their journey to Colonia LeBaron," while Rhonita borrowed a vehicle from her mother-in-law and resumed the journey. *Id.* at *3-4.

"A few minutes up the road, Rhonita's vehicle came under heavy gunfire from the first hit team" where "[f]or at least five to ten (5-10) minutes, assailants fired automatic and belt-fed machine gun rounds into Rhonita and her children's vehicle." *Id.* at *4. Later, "923 spent shell casings" that had been "shot by at least 23 different assault rifles" were found "in the vicinity of where Rhonita and her children were ambushed." *Id.* Though the vehicle had been hit by 321 bullets, a trauma surgeon testified with "a reasonable degree of medical certainty" that Rhonita and her children survived the initial assault. *Id.* The hit team set the vehicle on fire. *Id.* at *6. All occupants in the vehicle "'to a reasonable degree of medical certainty,' 'were all alive and conscious' when their vehicle was intentionally set on fire.'" *Id.* (citation omitted).

More than fourteen kilometers to the north, "Christina's vehicle was attacked by a separate group of members of the Cartel." *Id.* at \*7. This group fired more than 327 bullets, 41 of which hit Christina's vehicle. *Id.* at \*7-8. After the initial hail of bullets, "Christina 'stepped out of her vehicle with her hands up in the air saying that there [sic] were women and children and asking for them not to shoot, but still the assassins shot and killed her.'" *Id.* at \*8 (citation omitted and insertion in original). After being shot, Christina "was probably conscious for at least 10 or 15 minutes more, if not longer." *Id.* (citation omitted). Christina's seven-month-old somehow survived despite the appearance that a bullet "had nicked the very top of her head." *Id.* (citation omitted).

Soon thereafter, "Dawna and her children reached the location of Christina's bullet-ridden vehicle." *Id.* at \*9. Before they "could reach Christina, the Cartel began firing at Dawna's vehicle." *Id.* Dawna, her two-year-old son, and eleven-year-old son perished in the initial gunfire. *Id.* "After the shooting stopped, men wearing black camouflage suits and carrying guns walked down the mountain towards the surviving children" and "ordered the children to exit the vehicle despite the fact that many of the children had suffered grievous bullet wounds." *Id.* Then, "[a]fter the cartel members departed, the seven surviving children attempted to walk down the mountainous and rugged road to La Mora." *Id.* David Langford, the children's father, and other family members "convinced a local military unit to escort them to the location of the attacks, to try to rescue the children," and "[m]ore than ten hours after the attack, the military convoy located the children, and ambulances transported the children to a local hospital." *Id.*

In 2020, "family members, legal guardians of injured minors, legal guardians of surviving minor children and siblings of victims, and legal representatives of the estates of the nine victims killed brought claims" for monetary damages under the federal Antiterrorism Act of 1990, 18

U.S.C. § 2331 *et seq.*, in the United States District Court for the District of North Dakota and were awarded $4,641,337,011, as well as prejudgment and post-judgment interest. *Id.* at *1, 73-74.

### B.    Defendant Gutierrez-Ochoa's Offense Conduct

"Defendant was a member of the Cártel de Jalisco Nueva Generación" and "is connected to CJNG's top leadership." Stip. Facts ¶ 2. "The CJNG controls substantial drug trafficking routes from Mexico into the United States and imports tonnage quantities of illicit substances into the United States, including methamphetamine, cocaine, and other drugs," and "has expansive money laundering networks both in the United States and Mexico." *Id.* "Defendant knowingly conducted and participated in financial transactions with other CJNG money laundering operatives using CJNG's drug proceeds," knowing that "the financial transactions involved CJNG's drug proceeds and were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the CJNG's drug proceeds." *Id.* ¶ 3. To do so, he "assumed a fictitious identity, 'Luis Miguel Martinez,' to live in the United States, in part, to further CJNG's money laundering activities in the United States." *Id.*

"In November 2023, Defendant and his coconspirators completed two wire transfers totaling approximately $1.2 million U.S. dollars of CJNG's drug proceeds from Mexico to the United States to purchase a residential property located at 1191 Pamplona Drive, Riverside, California 92508 ('Pamplona Property')." *Id.* ¶ 4. The title to this property "is held by Pasion Azul, S.A. de C.V. ('Pasion Azul'), a Mexican entity owned and controlled by the CJNG." *Id.* "Defendant and others within the CJNG used Pasion Azul to launder CJNG drug proceeds" and did so "to further their efforts to make Pasion Azul appear to be fully a legitimate business that was purchasing the property with lawfully earned funds when, in fact, the property was purchased with CJNG drug proceeds." *Id.* Under his fictitious identity, defendant lived at the property "and

6

furthered CJNG's money laundering activities in the United States since at least November 2023 until his arrest there on November 19, 2024." *Id.*

"Defendant admits that the total amount of illicit funds laundered in the course of the underlying conspiracy for which he had actual knowledge and involvement was over $3,500,000," and, "[a]t the time of his arrest," he "possessed approximately $2.2 million of CJNG's drug proceeds in bulk U.S. currency at the Pamplona Property, in addition to multiple other items of value purchased with CJNG's drug proceeds, including jewelry, watches, and vehicles." *Id.* ¶¶ 5-6. The "drug proceeds were trans[ported], transmitted, and transferred to the United States from or through a place outside the United States." *Id.* ¶ 5. Defendant also "possessed an unregistered and untraceable 'ghost' firearm and another firearm with an obliterated serial number at the Pamplona Property in connection with the underlying money laundering offense." *Id.* ¶ 7.

## C.    Procedural Background of Instant Criminal Case

Defendant Gutierrez-Ochoa was charged by criminal complaint, on November 6, 2024, and then arrested in California on November 19, 2024. *See* Compl., ECF No. 1; Min. Entry (Nov. 19, 2024) (arrest of defendant). On June 20, 2025, he was arraigned on and entered a plea to Count Two of an information charging him with, "[b]eginning in or around October 2015, and continuing thereafter, up to and including November 2024," conspiring to "knowingly transport, transmit, and transfer, and attempt to transport, transmit, and transfer a monetary instrument and funds to a place in the United States from or through a place outside the United States, which monetary instrument and funds represented the proceeds of . . . narcotics trafficking, in violation of Title 21, United States Code, Sections 952, 959, 960, and 963, knowing that such transportation, transmission, and transfer was designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of such specified unlawful activity, and while conducting and attempting to conduct such transportation, transmission, and transfer, knowing that the

property involved in the transportation, transmission, and transfer represented the proceeds of some form of unlawful activity; all in violation of Title 18, United States Code, Section 1956(h)." Information, Count Two, at 2-3, ECF No. 20; Plea Agreement ¶ 1; Plea Tr. at 28:17-24.

The stipulated facts in support of defendant's guilty plea provide the bulk of the factual predicate for the Consent Preliminary Order of Forfeiture and, several weeks after the plea hearing, on July 10, 2025, defendant executed the Consent Preliminary Order of Forfeiture, agreeing to forfeit, pursuant to Federal Rule of Criminal Procedure 32.2(b)(1), two firearms and the Forfeited Assets comprised of: (1) "[a]pproximately $2,254,331.01 in U.S. currency seized from the defendant's residence on or about November 19, 2024"; (2) a "2024 BMW M4 vehicle"; (3) a "2019 Mini Countryman vehicle"; (4) a "2022 GMC Yukon Denali vehicle"; (5) "[a]ssorted artwork, paintings, and sculptures"; (6) "[a]ssorted watches"; (7) "[a]ssorted designer shoes"; (8) "[a]ssorted luxury purses"; (9) "[a]ssorted jewelry"; (10) "[a]n Hermes blanket"; and (11) "[t]he real property located at 1191 Pamplona Drive, Riverside, California."  POF at 1-2.

Several months later, petitioners in AVCT, representing "family members, legal guardians of injured minors, legal guardians of surviving minor children and siblings of victims, and legal representatives of the estates of the nine victims murdered on November 4, 2019," Pet. at 3, made their appearance in this case when they filed, in November 2025, the pending ancillary petition, *see generally id.*, which the government now moves to dismiss, *see* Gov't's Mot.[3]  As the scheduled sentencing date approached, defendant and the government were ordered, to submit

---

[3]    Petitioners were not the first to claim an interest in the Forfeited Assets.  Prior to the filing of their petition, Pasion Azul, a Mexican entity purportedly controlled by CJNG, sought leave, on September 26, 2025, to file a notice of claim to the California real property included in the Forfeited Assets.  *See* Not. of Claim by Pasion Azul, S.A., ECF No. 47.  This entity claimed to be "a successful agave company that supplies well-known tequila makers with agave (agave is the main ingredient in tequila) and also makes its own propriety tequila" and further claimed to have "purchased the property in about November of 2023 as an investment and to be used as a corporate residence in the future," making it "an innocent record owner of the real property at issue." *Id.*  A month later, in October 2025, Pasion Azul moved, without explanation, to withdraw its claim, *see* Pasion Azul's Mot. to Withdraw Not. of Claim, ECF No. 55, which motion was granted, *see* Min. Order (Oct. 30, 2025).

their position on, *inter alia*, whether this ancillary petition "must be resolved prior to or in conjunction with the defendant's sentencing," including "the effect, if any, of the Ancillary Petition on the issues to be resolved at sentencing regarding forfeiture and/or restitution." Min. Order (Dec. 8, 2025). The government responded that "the pending Ancillary Petition does not impact the Court's ability to go forward with the sentencing hearing" and that "no additional action is necessary at this time to effectuate the forfeiture or preserve the ancillary proceeding." Gov't's Resp. to Min. Order of Dec. 8, 2025, at 1-2, ECF No. 63. Petitioners, for their part, requested that the Court "[d]efer entry of any final order of forfeiture that would vest title in the United States until American Victims' rights under TRIA can be addressed" or "permit American Victims the opportunity to be heard at [Gutierrez-Ochoa's] sentencing before any such order is entered." AVCT's Resp. to Gov't's Resp. to the Court's Dec. 8, 2025, Min. Order at 4, ECF 65. Petitioners withdrew their requests the next day, however, after conferral with the government, which reportedly represented that "[t]he Court's oral pronouncement of forfeiture 'does not finalize the forfeiture in the manner of a final order of forfeiture,'" "will not shift funds out of the SADF [Seized Assets Deposit Fund], [and] it will not vest title of the assets in the government." ACVCT's Not. of Withdrawal of ECF No. 65 Following Conferral with the Gov't, ECF No. 66.

The following day, on December 18, 2025, on his conviction for money-laundering, in violation of 18 U.S.C. § 1956(a)(2)(B)(i), (h), defendant was sentenced to 140 months of incarceration, followed by 36 months of supervised release. *See* Judgment, ECF No. 67; Min. Entry (Dec. 18, 2025). The Judgment further directed that "the defendant shall forfeit the defendant's interest in the following property to the United States," and incorporated by reference the Consent Preliminary Order of Forfeiture, Judgment at 9, in accordance with the terms of

9

forfeiture order itself, which states it "shall be made part of the sentence and included in the judgment," POF ¶ 3.

## II.    LEGAL STANDARD

The criminal forfeiture statute, 18 U.S.C. § 982, authorizes the forfeiture of "any property, real or personal, involved in" an offense for violation of the money laundering statute, 18 U.S.C. § 1956, *see id.* § 982(a)(1), and directs that "any seizure and disposition of the property and any related judicial or administrative proceedings" are "governed by" 21 U.S.C. § 853, *see* 18 U.S.C. § 982(b)(1).  Section 853, in turn, authorizes third parties, "other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States" to "petition the court for a hearing to adjudicate the validity of his alleged interest in the property," which "hearing shall be held before the court alone, without a jury." 21 U.S.C. § 853(n)(2).  Upon "the court's disposition of all petitions filed under [21 U.S.C. § 853(n)], . . . the United States shall have clear title to property that is the subject of the order of forfeiture and may warrant good title to any subsequent purchaser or transferee." *Id.* § 853(n)(7).

Under Federal Rule of Criminal Procedure 32.2(c)(1), "[i]f, as prescribed by statute, a third party files a petition asserting an interest in the property to be forfeited, the court must conduct an ancillary proceeding, but no ancillary proceeding is required to the extent that the forfeiture consists of a money judgment." FED. R. CRIM. P. 32.2(c)(1).  Once an ancillary petition has been filed, "the court may, on motion, dismiss the petition for lack of standing, for failure to state a claim, or for any other lawful reason." *Id.* 32.2(c)(1)(A).  "[A] motion to dismiss a third-party petition in a forfeiture proceeding prior to discovery or a hearing should be treated like a motion to dismiss a civil complaint under Federal Rule of Civil Procedure 12(b)." *Willis Mgmt. (Vt.), Ltd. v. United States*, 652 F.3d 236, 241 (2d Cir. 2011) (alteration in original) (quoting *Pacheco v.*

10

*Serendensky*, 393 F.3d 348, 352 (2d Cir. 2004)); *see also, e.g.*, *United States v. Catala*, 870 F.3d 6, 8-9 (1st Cir. 2017); *United States v. Butt*, 930 F.3d 410, 413 (5th Cir. 2019); *United States v. Salti*, 579 F.3d 656, 667 (6th Cir. 2009); *United States v. Marion*, 562 F.3d 1330, 1342 (11th Cir. 2009). When considering such a "motion, the facts set forth in the petition are assumed to be true." FED. R. CRIM. P. 32.2(c)(1)(A). Thus, as with a civil complaint, to survive a motion to dismiss, a petition "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Factual allegations, although assumed to be true, must still 'be enough to raise a right to relief above the speculative level.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Twombly*, 550 U.S. at 555). Courts "do not assume the truth of legal conclusions, nor do [courts] 'accept inferences that are unsupported by the facts set out in the complaint.'" *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citing *Iqbal*, 556 U.S. at 678, then quoting *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 732 (D.C. Cir. 2007)).

If a motion to dismiss an ancillary petition is granted, no hearing is required. FED. R. CRIM. P. 32.2(c)(1)(A), (B).

## III.    DISCUSSION

The government challenges petitioners' Article III and statutory standing to bring the ancillary petition in this case, s*ee* Gov't's Mot. at 13-14 & 14 n.3, and the legal viability under relevant statutes of petitioners' claimed interest in the Forfeited Assets, *id.* at 14-19. The jurisdictional issue of whether petitioners have established Article III standing is addressed first and, though finding that they do have standing under the Constitution and the TRIA, the Court concludes that they fail to otherwise meet the statutory prerequisites for application of the TRIA § 201(a). Consequently, petitioners' ancillary petition to attach the Forfeited Assets fails on the

merits and must be dismissed for failure to state a claim, under Federal Rule of Criminal Procedure 32.2(c)(1)(A).

### A.    Standing

The government contends that petitioners lack Article III and statutory standing because they "hold a judgment against the Juárez Cartel" but "now seek to collect assets of CJNG, an entirely different cartel, and one of CJNG's members," when the CJNG is not even alleged to have "played a role in the attacks that led to their judgment." Gov't's Mot. at 11; *id*. at 13 ("Rather than possessing an interest in the forfeiture property, as they maintain they do, in fact they merely possess an unexecuted judgment against the Juárez Cartel[,]" which "judgment does not confer . . . a present interest in the forfeiture property, and they have failed to explain otherwise how an unexecuted judgment against a party not before the Court is sufficient to establish a cognizable injury." (quoting *Sun*, 2025 WL 1591868, at *3)). The government's view, in short, is that the cartel held liable in the 2022 Judgment is different from the cartel associated with the Forfeited Assets and this disconnect is fatal to petitioners' standing.

At the outset, the government correctly states that "a petitioner seeking to challenge forfeiture in an ancillary forfeiture" must show both constitutional and statutory standing, Gov't's Mot. at 9, but without clearly distinguishing the specific arguments being asserted to support the challenge to either type of standing and simply conflating the two, *see id.* at 9, 13, 14 n.3. Indeed, the government so fudged its standing arguments that petitioners captioned the first section of their opposition brief to highlight that "The Government does not challenge American Victims' Constitutional Standing," Pet'rs' Opp'n at 2 (caption), emphasizing that "[t]he government ***does not challenge*** American Victims' constitutional standing," *id.* at 3 (emphasis in original), necessitating that the government clarify this conclusion "is inaccurate," Gov't's Reply at 2 n.2. The D.C. Circuit has explained, "the term 'statutory standing' is a bit misleading," and "is not

really about standing at all, in the sense that it limits a court's statutory or constitutional *power* to adjudicate the case," and "[i]nstead, . . . is nothing more than an inquiry into whether the statute at issue conferred a cause of action encompassing a particular plaintiff's claim," which "is itself a merits issue." *United States v. Emor*, 785 F.3d 671, 676-677 (D.C. Cir. 2015) (quotations and citations omitted; emphasis in original). The government's argument as to petitioners' inability to show constitutional and statutory standing stems from the same reasoning and is unsuccessful as to both challenges.

### 1.     *Article III Standing*

To establish constitutional standing to assert the ancillary petition for attachment of the Forfeited Assets in partial satisfaction of the 2022 Judgment, petitioners "must show (i) that [they] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The government raises no issue as to petitioners' ability to meet the last factor of redressability for constitutional standing. *See generally* Gov't's Mot.; Gov't's Reply.[4] Instead, the government's standing challenge points to perceived defects in meeting the first and second factors. An injury in fact requires "an invasion of a legally protected interest," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992), and the government contends that petitioners have no legal interest in the Forfeited Assets because their injury was not caused by the CJNG.

---

[4]     Indeed, petitioners have met this third prerequisite for constitutional standing, since attachment of the Forfeited Assets "'would redress Petitioner Victims['] multi-billion dollar losses sustained' as a result of the November 4, 2019, massacre," Pet. at 4-5 (alteration accepted) (quoting *United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d 607, 622 (7th Cir. 2015)), and should the government take clear title to the Forfeited Assets, this conduct would result in "harm to the American Victims" through "[t]he deprivation of access" to those same assets, Pet'rs' Opp'n at 4.

In evaluating the government's challenge to subject matter jurisdiction, this Court is mindful of the D.C. Circuit's instruction that, "'[t]he requirements for a petitioner to demonstrate constitutional standing to challenge a forfeiture are very forgiving,'" and that, "[i]n general, any colorable claim on the property suffices, if the claim of injury is 'redressable, at least in part, by a return of the property.'" *Emor*, 785 F.3d at 676 (alterations accepted) (quoting *United States v. One-Sixth Share of James J. Bulger in All Present & Future Proceeds of Mass Millions Lottery Ticket No. M246233*, 326 F.3d 36, 41 (1st Cir. 2003), and *United States v. 7725 Unity Ave. N.*, 294 F.3d 954, 957 (8th Cir. 2002)).

Here, petitioners contest the very premise of the government's position as to a disconnect between the Juárez Cartel and the CJNG and defendant, proffering two facts to bolster their view that CJNG—and also defendant, by virtue of his admitted CJNG membership—are agents or instrumentalities of the Juárez Cartel. *See* Pet. at 14 ("Defendant Gutierrez-Ochoa is an agent or instrumentality of the CJNG," and "the CJNG's own status as an agency or instrumentality of the Juárez Cartel," combined with "Defendant Gutierrez-Ochoa's significant involvement with, and connections to, the CJNG establishes that he is an agency or instrumentality of the Juárez Cartel."). The proffered facts are the parties' stipulations (1) that "[t]he criminal defendant is or was a member of the Cártel de Jalisco Nueva Generación," and (2) that "[f]or purposes of any motion to dismiss or stay, the United States will not dispute that the CJNG is the primary source of illicit narcotics for the Juárez Cartel." Not. of Stipulations, ECF No. 74; *see* Gov't's Mot. at 11; Pet'rs' Opp'n at 2. These stipulations are consistent with petitioners' allegation "that the CJNG cartel operates as the Juárez Cartel's source of supply for cocaine, methamphetamine, and fentanyl," Pet. at 13 (citation and internal quotation marks omitted), an allegation that is supported by a U.S. Treasury Department press release, Pet. at 13 n.47 (citing Press Release, U.S. Dep't of Treasury,

14

Treasury Sanctions Key Members of La Linea, a Group Involved in Trafficking Fentanyl into the United States (Oct. 31, 2024) ("October 2024 Press Release")), which states, in relevant part, that "La Linea and the Cartel Jalisco Nueva Generacion (CJNG) have been working together since September 2023, with CJNG serving as La Linea's source-of-supply for cocaine, methamphetamine, and fentanyl," October 2024 Press Release.  In connection with the 2022 Judgment, La Línea is identified as the "violent armed wing" of the Juárez Cartel, *Miller*, 2022 WL 2286952, at *1, which identification is nowhere contested by the government here.

The government insists that, though the Juárez Cartel and the CJNG have "a business relationship akin to one between wholesale and retail seller of merchandise," this is not "*per se* sufficient to make CJNG an agency or instrumentality of the Juárez Cartel for Petitioners' purpose." Gov't's Mot. at 11.  This Court disagrees.  For constitutional standing purposes, the stipulated business relationship that most of the illegal narcotics purchased by the Juárez Cartel originated with the CJNG provides the basis for an inference that funds seized from the CJNG and its members, including defendant, may have come from, and be traced to, funds originating with the Juárez Cartel as the purchaser of the narcotics.  Indeed, in *Estate of Levin v. Wells Fargo Bank, N.A.* ("*Levin I*"), 45 F.4th 416 (D.C. Cir. 2022), a case concerning the government's efforts to quash attachment actions brought by "two groups of victims of Iranian terrorism and their relatives," under TRIA § 201(a) and 28 U.S.C. § 1610(g), the D.C. Circuit emphasized the importance of tracing funds back to the correct terrorist entity, stating that "under § 201, which deals only with assets that have already been blocked by the United States, terrorist victims may attach OFAC blocked electronic funds transfers if those funds can be traced to a terrorist owner," *id.* at 423.  Petitioners in the instant matter allege that the forfeited CJNG funds and property can be connected, or traced back, to the Juárez Cartel through the cartels' narcotics transactions, *see,*

15

*e.g.*, Pet. at 11, and this assertion is only bolstered by the stipulation that "the CJNG is the primary source of illicit narcotics for the Juárez Cartel."  Not. of Stipulations; *accord United States v. All Petroleum-Product Cargo Onboard the M/T Arina with Int'l Mar. Org. No. 9189952*, No. 24-5218, 2026 WL 1073317, at *2, *5-7 (D.C. Cir. Apr. 21, 2026) (affirming denial of private company's motion to dismiss government's civil forfeiture action, finding that the offense conduct of the National Iranian Oil Company ("NIOC"), by selling Iranian oil and "generat[ing] billions of dollars of annual revenue" for Iran to the benefit of the designated terrorist group, the Islamic Revolutionary Guard Corps ("IRGC"), provided "material support for the IRGC by acting as its 'agent or affiliate' in international oil transactions" and as "a major and direct source of funding for the IRGC").  Moreover, recall that the D.C. Circuit has explained that the requirement for constitutional standing in a forfeiture proceeding is "very forgiving" and that "any colorable claim on the property suffices."  *Emor*, 785 F.3d at 676 (citation omitted).  Set against that standard, petitioners have established a significant funding connection between the CJNG, which sold to and presumably required payment from the Juárez Cartel for most of the illegal narcotics fueling the operations of the latter cartel.  This tracing of narcotics proceeds originating with the Juarez Cartel and flowing to the CJNG provides a sufficient plausible inference of connection to the Forfeited Assets to avoid dismissal of their ancillary petition on Article III standing grounds.

### 2.   *Statutory Standing*

As noted, the government also challenges petitioners' statutory standing on the same ground used to argue for lack of Article III standing, namely, that the stipulated business relationship between the Juárez Cartel and CJNG is insufficient to meet the requirement under TRIA § 201 that assets subject to attachment for satisfaction of a judgment against the Juárez Cartel must be assets of that Cartel or its "agency or instrumentality," because the pre-seizure owners of the Forfeited Assets, namely, the CJNG and its agent defendant, do not qualify as agents

16

or instrumentalities of the Juárez Cartel.  Gov't's Mot. at 11; Gov't's Reply at 5-9.  The TRIA provides no definition of "agency or instrumentality," leaving courts to fashion guidance on this key issue on the scope of the statute.  The Second and Eleventh Circuits have addressed the issue, determining that "an entity can be an agency or instrumentality of a terrorist party for TRIA purposes in three ways: the entity (1) was a means through which a material function of the terrorist party is accomplished, (2) provided material services to, on behalf of, or in support of the terrorist party, *or* (3) was owned, controlled, or directed by the terrorist party.'"  *Kirschenbaum v. Assa Corp.*, 934 F.3d 191, 199 (2d Cir. 2019) (internal quotations omitted) (emphasis in original); *see also Stansell v. Revolutionary Armed Forces of Colom.* ("*Stansell I*"), 771 F.3d 713, 732 (11th Cir. 2014) (approving definition of "agency or instrumentality" set out by district court, in *Stansell v. Revolutionary Armed Forces of Colom.*, No. 09-cv-2308, 2013 WL 12133661, at *2 (M.D. Fla. May 2, 2013), to mean engaging in activities including "providing goods or services in support of[] the international narcotics trafficking activities of a specially designated narcotics trafficker," being "owned, controlled, or directed by, or acting on behalf of, a specially designated narcotics trafficker," or "playing a significant role in international narcotics trafficking"); *Stansell v. Revolutionary Armed Forces of Colom. (Farc)*, No. 10-mc-471 (TJK), 2019 WL 4040680, at *3-4 (D.D.C. Aug. 26, 2019) (adopting the Eleventh Circuit's definition).  The government focuses on only a part of those definitions, stating that "CJNG does not act on behalf of or under the control of Juárez Cartel, and CJNG certainly is not analogous to a branch of a Juárez Cartel governing body."  Gov't's Reply at 9.  This glosses over the other parts of the definition deeming an entity to be an instrumentality by serving as "a means through which a material function of the terrorist party is accomplished," "provid[ing] material services to . . . or in support of the terrorist party," *Kirschenbaum*, 934 F.3d at 199, or "providing goods or services in support of, the international

17

narcotics trafficking activities of a specially designated narcotics trafficker," *Stansell*, 2013 WL 12133661, at *2.

The government's stipulation that the CJNG served as the primary supplier of illicit narcotics to the Juárez Cartel is sufficient to show the CJNG was an instrumentality providing material services to and in support of the Juárez Cartel. Courts have acknowledged that this definition, "if broadly construed, . . . could invite lawsuits against a third-party institution, such as a bank, that had only incidental and perhaps unintentional involvement with a terrorist party." *Kirschenbaum*, 934 F.3d at 199. The government echoes this caution to urge that "[w]hile the Juárez Cartel and CJNG may at times have a strategic alliance to accomplish a common purpose, that type of relationship bears no resemblance to the 'plain and ordinary meaning' of the terms agency or instrumentality." Gov't's Reply at 8-9. Contrary to the government's contention, two appellate courts have provided similar definitions of the meaning in the TRIA of "agency or instrumentality," and the "strategic alliance" between these two cartels, *id.*, meets that definition. Moreover, the cautions concerning the breadth of these definitions as possibly encompassing innocent third parties that have only "incidental or . . . unintentional involvement with" the Juárez Cartel are simply inapplicable to the CJNG, which is no such innocent party and, as a primary supplier of illegal narcotics, provided critical product and services to the Juárez Cartel. Thus, this specific ground identified by the government for petitioners' lack of statutory standing fails.

### B.    Petitioners' Claim Fails on the Merits

Though overcoming the government's Article III and statutory standing challenges, *see supra* Part III.A, petitioners' ancillary petition otherwise fails on the merits. Petitioners assert that TRIA § 201 provides them "with the statutory, legal right to execute or attach their final judgment against *any* blocked assets of Defendant (Juárez Cartel) and/or *any* assets of *any* agency or instrumentality of the Juárez Cartel 'notwithstanding any other provision of law.'" Pet. at 3

18

(emphasis in original) (quoting TRIA § 201(a)).  The government disputes this assertion with multiple arguments grounded in the statutory regime governing criminal forfeiture and the limits expressly provided in the TRIA.  Those relevant statutes are reviewed first, before turning to analysis of the claimed right in the ancillary petition for petitioners to attach the Forfeited Assets under TRIA § 201(a).[5]

### 1.    *Criminal Forfeiture Under 18 U.S.C. § 982 and 21 U.S.C. § 853*

The Forfeited Assets at issue were seized and forfeited pursuant to the statutory authorization set out in 18 U.S.C. § 982(a), titled "Criminal Forfeiture," applicable to federal criminal defendants convicted of violating various federal statutes, with differences delineated in the scope and types of property subject to forfeiture, depending on the statute of conviction.  *See* 18 U.S.C. § 982(a)(1)-(6).  Defendant in this case was convicted of violating 18 U.S.C. § 1956, for which statute of conviction the criminal forfeiture statute provides that, "in imposing sentence on a person convicted of an offense in violation of section 1956 . . . of this title, [the court] shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property."  18 U.S.C. § 982(a)(1); *see* POF at 2 (stating that "[t]he Subject Property is hereby forfeited to the United States pursuant to 18 U.S.C. § 982(a)(1).").  As to the procedures to effectuate criminal forfeiture, as noted *supra* in Part II, § 982(b) instructs that: "[t]he forfeiture of property under this section, including any seizure and

---

[5]    The government also raises the policy concern that permitting this ancillary petition would endorse a "collection strategy [that] essentially turns federal criminal investigators into unwitting private collectors for Petitioners' private civil judgment."  Gov't's Mot. at 27.  This policy argument is similar to that raised by the government and rejected by the D.C. Circuit in *Estate of Levin v. Wells Fargo Bank, N.A.* ("*Levin II*"), 156 F.4th 632 (D.C. Cir. 2025).  There, the government cautioned that a broad interpretation of TRIA "might disrupt the Victims Fund," which "is now financed largely through forfeiture actions pursued by the United States against the blocked assets of terrorist parties," because "when a judgment holder invokes TRIA to recover assets that would otherwise be forfeited, he takes funds that would otherwise be distributed more broadly and more equitably to similarly situated holders of terrorism-related judgments."  *Levin II*, 156 F.4th at 644.  The D.C. Circuit was clear that "any anomaly in the interaction between the Victims Fund and TRIA is a problem for Congress, not the judiciary."  *Id.*  Likewise, here, should the government effectively become public collectors for private civil judgments, this consequence is for Congress to address and cannot dictate the outcome here.

disposition of the property and any related judicial or administrative proceeding, shall be governed by the provisions of section 413 (other than subsection (d) of that section) of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. [§] 853)."  18 U.S.C. § 982(b)(1).

This referenced section of the Comprehensive Drug Abuse Prevention and Control Act of 1970—21 U.S.C. § 853, also titled "Criminal Forfeitures"—governs the criminal forfeiture of property described in 18 U.S.C. § 982(a) and the property of defendants convicted of a felony violation of the Controlled Substances Act and related laws, codified in Chapter 13, titled "Drug Abuse Prevention and Control," of title 21.  *See* 21 U.S.C. § 853(a)(1) (relating to "[a]ny person convicted of a violation of this subchapter or subchapter II punishable by imprisonment for more than one year shall forfeit to the United States, irrespective of any provision of State law").  As pertinent here, § 853 expressly "vests" in the United States title and right to the forfeited property at the time of the offense conduct underlying the conviction, with an exception for bona fide purchasers.  This "relation-back" provision states, in full:

> All right, title, and interest in property described in subsection (a) vests in the United States upon the commission of the act giving rise to forfeiture under this section.  Any such property that is subsequently transferred to a person other than the defendant may be the subject of a special verdict of forfeiture and thereafter shall be ordered forfeited to the United States, unless the transferee establishes in a hearing pursuant to subsection (n) that he is a bona fide purchaser for value of such property who at the time of purchase was reasonably without cause to believe that the property was subject to forfeiture under this section.

21 U.S.C. § 853(c).

The D.C. Circuit has determined that such relation-back text, "which applies in cases involving civil and criminal forfeiture provisions," "is squarely governed by the Supreme Court's holding that 'whenever a statute enacts that upon the commission of a certain act specific property used in or connected with that act shall be forfeited, the forfeiture takes effect immediately upon the commission of the act.'"  *All Petroleum-Product Cargo*, 2026 WL 1073317, at *3 (quoting

*United States v. Stowell*, 133 U.S. 1, 16 (1890)).  Under this rule, "[a]lthough a judicial proceeding must 'perfect' the government's title, that title, 'when obtained, relates back' to 'the time the offense is committed.'" *Id.* (alteration accepted) (quoting *Stowell*, 133 U.S. at 16).

Another subsection of § 853 outlines the procedures for providing notice to and adjudication of third-party interests in forfeited property, *see* 21 U.S.C. § 853(n)(1), and authorizes, following notice, "[a]ny person, other than the defendant, asserting a legal interest in property which has been ordered forfeited to the United States pursuant to this section" to "petition the court for a hearing to adjudicate the validity of his alleged interest in the property," *id.* § 853(n)(2).  At a "hearing on the petition," the petitioner and government may present testimony and other evidence and "the court shall consider the relevant portions of the record of the criminal case which resulted in the order of forfeiture."  *Id.* § 853(n)(4)-(5).  "[A]fter the hearing," the court must amend the forfeiture order granting the property's title to the United States, upon determining that "the petitioner has established by a preponderance of the evidence[,]" the petitioner's own "legal right, title, or interest in the property," which either "was vested in the petitioner" or "superior to" the defendant's interest "at the time of the commission of the acts which gave rise to the forfeiture of the property under this section," or the petitioner meets the requirements for a bona fide purchaser.  *Id.* § 853(n)(6)(A), (B).

The filing of an ancillary petition, as described in § 853(n), is the only procedural mechanism for a third party to assert a legal claim in court to property subject to criminal forfeiture. *See id.* § 853(k) (barring, "[e]xcept as provided in subsection (n)," a party claiming an interest in forfeited property from "interven[ing] in a trial or appeal of a criminal case involving the forfeiture of such property under this section" or "commenc[ing] an action at law or equity against the United States concerning the validity of his alleged interest in the property subsequent to the filing of an

indictment or information alleging that the property is subject to forfeiture under this section");

*see also Libretti v. United States*, 516 U.S. 29, 44 (1995) ("Once the Government has secured a

stipulation as to forfeitability, third-party claimants can establish their entitlement to return of the

assets only by means of the hearing afforded under 21 U.S.C. § 853(n)."); *Emor*, 785 F.3d at 675

("The sole forum for a third party to address its interest in forfeited property is through a third

party ancillary proceeding." (citing 21 U.S.C. § 853(n))).[6]

### 2.    *TRIA § 201*

TRIA § 201(a) is codified as a note to a section of the Foreign Sovereign Immunities Act

of 1976 ("FSIA"), 28 U.S.C. § 1610 (titled "Exceptions to the Immunity from Attachment or

Execution"), and provides, in full:

> Notwithstanding any other provision of law, and except as provided in subsection (b), in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605A or 1605(a)(7) (as such section was in effect on January 27, 2008) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA § 201(a).

This statute "is a civil remedy providing for the execution and attachment of assets to

satisfy certain judgments against terrorist parties." *Stansell v. Revolutionary Armed Forces of

Colom.* ("*Stansell II*"), 45 F.4th 1340, 1355 (11th Cir. 2022). Reliance on this provision requires

that the petitioner obtain a judgment against a designated "terrorist party" for that party's act of

---

[6]    Alternatively to filing a petition or claim in a judicial proceeding, as authorized in 21 U.S.C. § 853(n), a third party may assert a competing interest in forfeited property administratively, since the Attorney General is authorized to, among other actions, "(1) grant petitions for mitigation or remission of forfeiture, restore forfeited property to victims of a violation of this subchapter, or take any other action to protect the rights of innocent persons which is in the interest of justice and which is not inconsistent with the provisions of this section; (2) compromise claims arising under this section; [and] (3) award compensation to persons providing information resulting in a forfeiture under this section."  21 U.S.C. § 853(i).

terrorism.  Further, the terrorist party must not have immunity under specified provisions of the FSIA, which generally grants foreign states and their agents and instrumentalities "immun[ity] from attachment, arrest, and execution."  28 U.S.C. § 1609.  Also, importantly, the assets the petitioner seeks to attach under this provision must constitute "blocked assets of that terrorist party" or of the terrorist party's "agency or instrumentality."

TRIA § 201 defines the "blocked assets" subject to attachment in aid of execution of a judgment against a designated terrorist party with express limitations.  *See* TRIA § 201(d)(2)(A).  Specifically, the blocked asset must be "seized or frozen by the United States under" the authority of one of three statutes: (1) "section 5(b) of the Trading With the Enemy Act [("TWEA"), 50 U.S.C. § 4305(b)]," *id.*; (2) "sections 202 and 203 of the International Emergency Economic Powers Act [("IEEPA"), 50 U.S.C. §§  1702, 1703]," *id.*; or (3) "section 805(b) of the Foreign Narcotics Kingpin Designation Act [("Narcotics Kingpin Act"), 21 U.S.C. § 1904(b)]," 18 U.S.C. § 2333(e).  *See United States v. Holy Land Found. for Relief & Dev.*, 722 F.3d 677, 685 (5th Cir. 2013) (holding that "[b]y its terms, [TRIA] § 201 does not provide for execution against assets that are not blocked"); *Wyatt v. Syrian Arab Republic*, 83 F. Supp. 3d 192, 195 (D.D.C. 2015) (explaining, under TRIA § 201, "blocked assets only include property 'seized or frozen by the United States' pursuant to enumerated sections of" specified statutes).  Petitioners insist that the Forfeited Assets are "blocked assets," within the meaning of TRIA § 201(a), based on the operation of IEEPA and the Narcotics Kingpin Act, *see* Pet. at 7-11, which are described next.

### (a)    *Blocking Assets Under IEEPA*

"Enacted in 1977, IEEPA gives the President economic tools to address significant foreign threats."  *Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 636 (2026).  IEEPA permits the President to "investigate, regulate, or prohibit transactions in foreign exchange, banking transfers, and

importation or exportation of currency or securities by persons or with respect to property, subject to the jurisdiction of the United States." *Holy Land Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 159 (D.C. Cir. 2003) (citing 50 U.S.C. § 1702(a)(1)(A)).  Specifically, the President may "investigate, block during the pendency of an investigation, regulate, direct and compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States."  50 U.S.C. § 1702(a)(1)(B).

On December 15, 2021, the President issued, pursuant to IEEPA and other statutes, Executive Order 14059, titled "Imposing Sanctions on Foreign Persons Involved in the Global Illicit Drug Trade," authorizing the Secretary of the Treasury to determine whether a foreign individual or entity engaged in drug trafficking activities and, among other authorized actions, to "block all property and interests in property of the sanctioned person that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person, and provide that such property and interests in property may not be transferred, paid, exported, withdrawn, or otherwise dealt in."  Exec. Order No. 14059 §2(a)(i), 86 Fed. Reg. 71549, 71550 (Dec. 15, 2021).  As authorized by the Executive Order, the Department of Treasury, through its component the Office of Foreign Assets Control ("OFAC"), designated CJNG and the Juárez Cartel as Specially Designated Nationals and Blocked Persons "for having engaged in, or attempted to engage in, activities or transactions that have materially contributed to, or pose a significant risk of materially contributing to, the international proliferation

24

of illicit drugs or their means of production." Notice of OFAC Sanctions Actions, 86 Fed. Reg. 72307, 72309-10 (Dec. 21, 2021); *see* 31 C.F.R. § 599.201.

Notably, Executive Order 14059 authorizes exceptions to the prohibitions outlined in Section 2 as "provided . . . in regulations . . . or licenses." Exec. Order No. 14059 § 3. OFAC has issued such an exception providing a "general license" that "[a]ll transactions prohibited by this part that are for the conduct of the official business of the United States Government by employees, grantees, or contractors thereof are authorized." 31 C.F.R. § 599.509 (titled "Official business of the United States Government.").

### (b)    Blocking Assets Under Narcotics Kingpin Act

"The Kingpin Act authorizes the President to designate 'foreign persons that play a significant role in international narcotics trafficking' as 'significant foreign narcotics traffickers'" and "also authorizes the Secretary of the Treasury, in consultation with other Executive Branch officials, to designate as 'specially designated narcotics traffickers' foreign persons they believe to be 'materially assisting in, or providing financial or technological support for or to, or providing goods or services in support of,' or 'owned, controlled, or directed by, or acting for or on behalf of' a significant foreign narcotics trafficker designated under 21 U.S.C. Section 1903(b)." *López Bello v. Smith*, 651 F. Supp. 3d 20, 27 (D.D.C. 2022) (RBW) (alterations accepted) (quoting 21 U.S.C. §§ 1903(b), 1904(b)(2)-(3), 1907(7), and 31 C.F.R. § 598.314(b)(1)-(2)).

OFAC has designated the Juárez Cartel and CJNG as specially designated narcotics traffickers under the Narcotics Kingpin Act. *See* Alphabetical Listing of Blocked Persons, Specially Designated Nationals, Specially Designated Terrorists, Specially Designated Global Terrorists, Foreign Terrorist Organizations, and Specially Designated Narcotics Traffickers, 70 Fed. Reg. 38257, 38328 (July 1, 2005) (Juárez Cartel); Additional Designations, Foreign Narcotics

Kingpin Designation Act, and Unblocking of One Individual Blocked Pursuant to Executive Order 13382 of June 28, 2005, 80 Fed. Reg. 20293, 20294 (Apr. 15, 2015) (CJNG).  As a result, "[a]ll property and interests in property that are in the United States, that come within the United States, or that are or come within the possession or control of any U.S. person" of these two cartels "are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in."  31 C.F.R. § 598.202(a).

Holders of assets blocked by the Narcotics Kingpin Act are required to "hold or place such funds in a blocked interest-bearing account located in the United States," which account is subject to certain restrictions.  31 C.F.R. § 598.206(a).[7]  The government points out that OFAC has promulgated a regulation exempting the government from these Narcotics Kingpin Act requirements.  Gov't's Mot. at 24, 26 & n.11; Gov't's Reply at 12-13.  Identical to the general license OFAC issued under Executive Order 14059, the regulation issued under the Narcotics Kingpin Act states, in full, that "[a]ll transactions prohibited by this part that are for the conduct of the official business of the United States Government by employees, grantees, or contractors thereof are authorized."  31 C.F.R. § 598.513.  As a result of this general license, the government posits that when the government obtains criminal forfeiture of a criminal defendant's property, even when the defendant or the owner of the property is designated under the Narcotics Kingpin Act, the blocking provisions promulgated under that act do not apply because these official actions "are authorized."  *See* Gov't's Reply at 12-13; *see also* Addition of General Licenses for the Official Business of the United States Government and Certain International Organizations and

---

[7]     For instance, financial institutions "holding, unblocking, or transferring property blocked" must "within 10 business days from the date that property becomes blocked," file reports with OFAC that includes a description of "[a]ny action taken with respect to the property" like "depositing the property into a new or existing blocked, interest-bearing account that is labeled as such and is established in the name of, or contains a means of clearly identifying the interest of, the person subject to blocking."  31 C.F.R. § 501.603(a)(1), (b)(1)(i), (b)(1)(ii)(G).

Entities and Updates to the 50 Percent Rule Interpretive in OFAC Sanctions Regulations, 87 Fed. Reg. 78470 (Dec. 21, 2022).

### 3.  *Forfeited Assets Were Not Blocked Within the Meaning of the TRIA*

The Forfeited Assets were not blocked within the meaning of TRIA § 201(a), rendering this provision unapplicable and unavailable to petitioners to claim an interest in the Forfeited Assets.  For TRIA § 201(a) to apply, the asset at issue must be "blocked," by being "seized or frozen by the United States under" the authority of TWEA, IEEPA, or the Narcotics Kingpin Act. *See* TRIA § 201(d)(2)(A); 18 U.S.C. § 2333(e).  While agreeing that the Forfeited Assets were not "seized" pursuant to the TWEA, IEEPA or Kingpin Act, as required by TRIA § 201(a), Pet'rs' Opp'n at 15-16; Gov't's Mot. at 15-16, the parties dispute whether and which of those assets were "frozen."[8]  Petitioners contend that all the Forfeited Assets are frozen "by operation of law" under IEEPA and the Narcotics Kingpin Act, *see* Pet'rs' Opp'n at 15 (capitalization altered), whereas the government concedes that only the Pamplona Property and seized cash were frozen "by operation of law" and not "the remaining personal property," Gov't's Mot. at 16 ("For purposes of this motion to dismiss, the government does not dispute Petitioner's assertion that the Pamplona Property or seized cash are blocked assets" because "CJNG is a designated entity and it may have had an interest in both assets, those assets may have become blocked by operation of law," and "the remaining personal property was (before the Preliminary Order terminating his interests in it) the Defendant's, not CJNG's," as "they are not owned by CJNG, nor does the cartel have any remaining interest in them.").

Neither side is correct.  None of the Forfeited Assets were "seized or frozen" under TWEA, IEEPA, or the Narcotics Kingpin Act, as required by the TRIA.  *See* TRIA § 201(d)(2)(A).  To

---

[8]  The parties imprecisely use the word "blocked" interchangeably with "frozen" in their briefing.

start, the Forfeited Assets were seized and then forfeited in connection with a criminal action, pursuant to 18 U.S.C. § 982 and 21 U.S.C. § 853, and those criminal forfeiture statutes appear nowhere in the definition of "blocked assets" subject to TRIA § 201. *Id.* Furthermore, the ancillary petition is devoid of any allegation, nor does the record support any allegation, that, prior to defendant's arrest—and the virtually simultaneous initiation of the criminal seizure and forfeiture process, *see* Gov't's Mot. at 16 ("The Information's forfeiture allegation supports a different conclusion—that agents seized the Forfeited Assets under the criminal forfeiture statutes as proceeds of the defendant's drug trafficking and as property involved in money laundering." (citing Information at 3-4)); Presentence Report ¶ 86, ECF No. 48 (noting that the Forfeited Assets were seized at the time of defendant's arrest)—that the Forfeited Assets were ever frozen in any manner, including, for instance, by operation of an "OFAC blocking order [that] provides that [funds] 'may not be transferred, paid, exported, withdrawn or otherwise dealt in without prior authorization from OFAC'" such that "the Funds may do nothing but sit in a bank account," *Estate of Levin v. Wells Fargo Bank, N.A.* ("*Levin II*"), 156 F.4th 632, 638-39 (D.C. Cir. 2025) (citation omitted). In other words, before defendant's arrest, the record lacks any indication of any restriction on defendant's ability to sell the California property, spend freely the over $2.25 million in cash recovered from his home, or transfer his personal items, either on his own behalf or that of the CJNG. The Forfeited Assets were therefore not restricted at all, let alone "subject to a significant restriction." *Id.* at 639 (defining "frozen"). Consequently, the Forfeited Assets were neither seized nor frozen under the TWEA, IEEPA, or the Narcotics Kingpin Act, *see* 50 U.S.C. § 4301 *et seq.*; 50 U.S.C. § 1701 *et seq.*; 21 U.S.C. § 1901 *et seq.*, respectively, at any time before defendant was arrested and those assets were identified and listed in the Consent Preliminary Order of Forfeiture, or subsequently, when these assets were firmly under the government's control, with

28

title vesting in the United States, pending "clear" title upon resolution of any ancillary petitions, 21 U.S.C. § 853(n)(7).

Indeed, when an ancillary petition in a criminal matter is upheld as demonstrating, for example, the petitioner's statutorily-recognized interest in the property "superior" to the defendant's or as a bona fide purchaser, 21 U.S.C. § 853(n)(6)(A), (B), the court is required to amend the forfeiture order to clarify the extent of the United States' title, *id*. § 853(n)(6). The criminal forfeiture statutes and procedural rules nowhere contemplate beyond those steps that, when a criminal defendant, whose assets are forfeited, turns out to be designated under IEEPA or the Narcotics Kingpin Act, an additional step is necessary of obtaining a specific OFAC license before a court may make an appropriate modification of the forfeiture order for a prevailing ancillary petitioner or before transfer of any assets may be made to a successful petitioner.[9] In short, TRIA § 201(a) does not apply here.

---

[9] Subparagraph (B) of the TRIA's definition of "blocked asset" excludes property that "is subject to a license issued by the United States Government for . . . transfer, or disposition by or to a person subject to the jurisdiction of the United States in connection with a transaction for which the issuance of such a license has been specifically required by statute other than the [IEEPA]." TRIA § 201(d)(2)(B)(i). The parties do not cite this definitional subparagraph nor discuss with any precision whether OFAC's general licenses, *see supra* in Part III.B.2 (discussing 31 C.F.R. §§ 598.513, 599.509), authorizing official government action in disposing of otherwise blocked assets, qualify for this definitional exception, though they do generally dispute the impact of general licenses on criminal forfeiture, *see* Gov't's Reply at 13-15 (defending validity of general license because "creation of that license was lawful," and arguing that "[c]onferring the general license on the government allows the government to continue to use asset forfeiture as a weapon in its arsenal against foreign cartels and drug trafficking organizations (DTOs)."); Pet'rs' Opp'n at 14-15, 14 n.69 (challenging general license as "most likely in violation of the Administrative Procedures Act" and arguing, in heavy reliance on *Levin II,* that the "government's alleged license is precisely the type of 'mischief' TRIA was enacted to prevent."). Indeed, as petitioners highlight, broad language in *Levin II* casts doubt on reading OFAC general licenses as qualifying for the exception under TRIA § 201(d)(2)(B)(i), to authorize official government action to dispose of criminally forfeited assets belonging to a designated terrorist or narcotics kingpin entity. The D.C. Circuit rejected the view that "*any* license operates to un-freeze and un-block assets for TRIA purposes" because "the license exception—with all of its qualifications regarding the covered kinds of licenses and statutory authorities—would be surprisingly reduced to surplusage." *Levin II*, 156 F.4th at 640. In any event, drilling down into the validity of OFAC's general licenses or the import of *Levin II*'s broad language here is unnecessary. To the extent this language is intended to read the TRIA as requiring the government and/or successful ancillary petitioners to secure specific OFAC licenses in order for courts in criminal cases to be able to order the final disposition of, and clear title to, criminally forfeited assets that may otherwise constitute blocked assets, this possibility is irrelevant where, as here, the Forfeited Assets were never frozen, as required by TRIA § 201(d)(2)(A).

Petitioners attempt to circumvent these limitations imposed by the statutory definition of "blocked assets" in TRIA § 201(d)(2)(A), through a "novel approach," Gov't's Mot. at 27, relying heavily on the congressional floor debate during enactment of TRIA § 201(a) and on the "notwithstanding" clause in the text of this provision. *See, e.g.*, Pet. at 2 & n.7. Neither of these sources command the result urged by petitioners that the TRIA provides broad authority to attach assets seized and forfeited pursuant to the criminal forfeiture statutes.

As to the floor debate, petitioners cherry pick from the statement of a single Senator, who stated this provision was created "to obtain 'some measure of justice and compensation'" for terrorism victims, to contend that finding the TRIA inapplicable here would render the congressional enactment "mere surplusage." Pet'rs' Opp'n at 1 (quoting 148 CONG. REC. S11524-01 (statement of Sen. Tom Harkin)); *see also id.* at 1 nn. 3-4, 2 n.7, 6 n.24, 14 n.67, 18 n.89, 20 n.96 (citing same Sen. Harkin statement); Pet. at 2 n.6, 7 n.25, 8 n.30, 11 n.42 (citing same Sen. Harkin statement). As a threshold matter, "courts 'do not resort to legislative history to cloud a statutory text that is clear.'" *Am. Fuel & Petrochemical Mfrs. v. Env't Prot. Agency*, 3 F.4th 373, 383 (D.C. Cir. 2021) (quoting *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994)). More significantly, the D.C. Circuit has already considered and deftly rejected a similar argument to that presented by petitioners here based on the TRIA floor debate. In *Heiser v. Islamic Republic of Iran*, 735 F.3d 934 (D.C. Cir. 2013), plaintiffs seeking to collect on a judgment against Iran, attempted to attach funds blocked during transfer through an American bank where "Iranian entities were not the originators of the funds transfers" nor "the ultimate beneficiaries," but rather "[t]he transfers were blocked because the beneficiaries' banks were Iranian," and those Iranian banks "would have had a contingent future possessory interest in the funds." *Id.* at 936-37. The D.C. Circuit observed that "[p]laintiffs cite the floor debate over [TRIA] § 201 to argue that

Congress wanted to compensate terrorism victims with blocked assets[, b]ut plaintiffs misinterpret the debate." *Id.* at 939. Explaining the context of the floor debate as focused on 28 U.S.C. § 1610(f), which permits execution or attachment of property of a foreign state blocked under certain provisions in TWEA, IEEPA, or the Foreign Assistance Act of 1961, 22 U.S.C. § 2370(a), the D.C. Circuit determined that "Congress had a narrower concern" than to generally "compensate terrorism victims with blocked assets." *Id.* Congressional concern was about presidential action in that "28 U.S.C. § 1610(f)(1) purportedly allowed creditors holding judgments . . . to attach blocked property," but "[t]he President waived § 1610(f)(1) in almost all cases after finding that attachment of blocked property would 'impede the ability of the President to conduct foreign policy' and 'impede the effectiveness of . . . prohibitions and regulations upon financial transactions.'" *Id.* (ellipses in original) (citation omitted). Thus, Congress created § 201(a) which "builds upon and extends the principles in section 1610(f)(1) . . . and eliminates the effects of any Presidential waiver issued prior to the date of enactment." *Id.* (ellipsis in original) (quoting H.R. REP. NO. 107-779, at 27, and citing *Ministry of Def. & Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366, 386 (2009)).

In *Elahi*, the plaintiff attempted to use TRIA § 201(a) to attach a final arbitral award in favor of the Ministry of Defense of the Islamic Republic of Iran. 556 U.S. at 368. Previously, the plaintiff had received $2.3 million "as partial compensation for his judgment against Iran" from a congressionally created fund, which conditioned payment on relinquishing "all rights to execute against or attach property that is at issue in claims against the United States before an international tribunal." *Id.* at 379 (emphasis removed). The act creating this fund had been amended by TRIA § 201(c). *Id.* In response to plaintiff's argument that TRIA's "notwithstanding" clause invalidated the effect of this relinquishment condition, the Supreme Court reasoned that "Congress could not

31

have intended the words to which *Elahi* refers to narrow so dramatically an important provision that it inserted in the same statute." *Id.* at 386.  Indeed, the Supreme Court identified the same congressional purpose as did the D.C. Circuit in *Heiser*, finding that "the history suggests that Congress placed the 'notwithstanding' clause in § 201(a) for totally different reasons, namely, to eliminate the effect of any Presidential waiver issued under 28 U.S.C. § 1610(f) prior to the date of the TRIA's enactment." *Id.*; *see also In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 55, 87 (D.D.C. 2009) (RCL) (citing *Elahi*, comprehensively reviewing historical context leading up to enactment of the TRIA, including repeated presidential waivers "in the interest of national security," under 28 U.S.C. § 1610(f)(3), of provisions in § 1610(f), "which allowed for the first time attachment and execution against blocked assets of state sponsors of terrorism," to find that the "notwithstanding" clause in TRIA § 201(a) was intended to address presidential waivers issue under the FSIA's § 1610(f)).

    In addition to the congressional floor debate, petitioners look to the "notwithstanding" clause beginning the first line in TRIA § 201(a) to argue that this text "unequivocally stand[s] for the proposition that 'notwithstanding any other provision of law', 'in every case' where an American Victim of terrorism seeks to attach or execute their judgment against the blocked asset(s) of a terrorist party or their agencies or instrumentalities, said judgments shall 'be enforced against any assets available in the U.S., and [] the executive branch has no statutory authority to defeat such enforcement under standard judicial processes.'"  Pet. at 6-7 (second alteration in original) (quoting 148 CONG. REC. S11524-01 (daily ed.) (statement of Sen. Harkin)).  Petitioners point to language in *Levin II* ascribing a far broader purpose to the TRIA than overcoming presidential waivers, under the FSIA's § 1610(f)(3), to overcome any other statutory regime. Pet'rs' Opp'n at 15 (discussing *Levin II*, 156 F.4th at 639-640).  At issue in *Levin II* were funds halted in transit;

32

specifically, after being "[a]lerted by OFAC," Wells Fargo halted the transfer of" $9.98 million sent by an instrumentality of Iran "and placed the Funds in a South Dakota account." *Id.* at 637. "OFAC then issued an order memorializing that the Funds were blocked under section 203 of IEEPA, Executive Order 13,224, and 31 C.F.R. § 594.201" and, once "the government moved to confiscate them by civil forfeiture," issued a specific license "authorizing the government 'to engage in all transactions necessary and ordinarily incident to effect the forfeiture' of the Funds." *Id.* (citation omitted). Wells Fargo was permitted to "relinquish custody of the Funds, but only to the government, and only if the government" possessed a valid forfeiture order, but "[u]ntil then, OFAC's license did not permit Wells Fargo to do anything with the Funds." *Id.* The D.C. Circuit critiqued the government's argument that the issuance of an OFAC license to unfreeze the assets at issue resulted in unblocking the assets, putting them outside the reach of TRIA—at least for the government—concluding that "[t]he whole point of section 201 was to eliminate the President's discretion to prevent victims of state-sponsored terrorism from attaching blocked assets" and that "[i]f the government were right, then section 201 would not prevent the very mischief that Congress sought to address—that provision would allow the Executive to thwart attachment of blocked assets simply by authorizing itself to initiate forfeiture proceedings." *Levin II*, 156 F.4th at 639.[10] Petitioners rightly seize on this reasoning, Pet'rs' Opp'n at 15, as presenting a broader interpretation of the legislative purpose than disallowing presidential waivers for national security interests, under 28 U.S.C. § 1610(f)(3), as described in *Elahi* or *Heiser*. Indeed, in what the government characterizes as "dicta included in a footnote about an argument not then before the

---

[10]    The *Levin* court cites *Elahi* for the proposition that "[t]he whole point of section 201 was to eliminate the President's discretion to prevent victims of state-sponsored terrorism from attaching blocked assets," *Levin II*, 156 F.4th at 639 (citing *Elahi*, 556 U.S. at 386), but the cited text actually states, more narrowly, that "we point out that the history suggests that Congress placed the 'notwithstanding' clause in § 201(a) for totally different reasons, namely, to eliminate the effect of any Presidential waiver issued under 28 U.S.C. § 1610(f) prior to the date of the TRIA's enactment, *Elahi*, 556 U.S. at 386 (citing H.R. Conf. Rep. No. 107-779, at 27).

court," Gov't's Reply at 13 n.8, the *Levin II* court expresses the view based on the facts in that case—which involved a blocking order, funds being frozen during a transfer, and an OFAC order memorializing that the funds were blocked—that the "notwithstanding" clause "'clearly requires courts to disregard other statutory provisions that conflict with the scope of the TRIA,'" and that "if TRIA specifically allows attachments that the civil-forfeiture statute specifically prohibits, TRIA prevails," *Levin II*, 156 F.4th at 643 n.1 (quoting *Greenbaum v. Islamic Republic of Iran*, 67 F.4th 428, 432 (D.C. Cir. 2023)).

The "notwithstanding" clause is generally understood to operate to abrogate a foreign state's sovereign immunity. Indeed, in *Greenbaum*, cited in the *Levin II* footnote relied upon by petitioners, the D.C. Circuit observed that "§ 1609 of the FSIA expressly grants the property of foreign states immunity from execution, but § 201(a) of the TRIA supersedes that provision insofar as it applies to the 'blocked asset' of a 'terrorist party,'" and goes on to explain that the phrase "notwithstanding other any provision of law" has limitations and does not present a clear statement sufficient "to waive federal sovereign immunity." 67 F.4th at 432. Other circuits have also reasoned that the "notwithstanding" clause works to abrogate a foreign state's immunity from execution and attachment. *See, e.g.*, *Rubin v. Islamic Republic of Iran*, 709 F.3d 49, 54 (1st Cir. 2013) ("Nonetheless, under certain circumstances, TRIA permits the attachment of property that might otherwise be immune under the FSIA."); *Havlish v. Taliban*, 152 F.4th 339, 359 (2d Cir. 2025) (stating that the "notwithstanding" clause "carries great weight in our analysis of how the TRIA interacts with the FSIA" and that "there can be no doubt that the FSIA's execution immunity provisions are superseded by the TRIA").

Reconciling whether the analysis of *Heiser* and *Elahi* or broad language in *Levin II* properly delineates the scope of the TRIA's "notwithstanding" clause is a puzzle that need not be

resolved here because the assets were not blocked within the meaning of TRIA and even the broadest reading of the "notwithstanding" clause cannot plausibly suggest that TRIA applies when the prerequisites of TRIA have not been satisfied.

### 4.    *Even if the TRIA Applies, Petitioners Still Fail to State a Claim*

Even if the Forfeited Assets satisfied the definition for "blocked asset[s]" to trigger the applicability of TRIA § 201(a), petitioners have not provided a legal theory as to how their claim to these assets would satisfy 21 U.S.C. § 853(n)(6), which governs ancillary petitions seeking title to criminally forfeited assets.  Recall, that in order for petitioners' ancillary petition to prevail, they must establish a "legal right, title, or interest in the property," which either (1) "was vested in the petitioner" or "superior to" the defendant's interest "at the time of the commission of the acts which gave rise to the forfeiture of the property under this section," or (2) that they meet the requirements for a bona fide purchaser.  *Id.* § 853(n)(6)(A), (B); *see supra* Part III.B.1.  For their part, petitioners never argue that any legal interest in the property had vested with them or that they are bona fide purchasers of the property, under § 853(n)(6)(A) or (B), but contend they have a superior legal interest in the property than did the criminal defendant at the time of the offense conduct.  *See* Pet. at 14.  Petitioners' theory has two critical flaws: the TRIA cannot serve as the basis for a legal interest in the property and the United States has a statutory legal interest in and title to the Forfeited Assets.

Petitioners assert that the "evaluation under the TRIA of the priority of interests" in the Forfeited Assets "must begin with the understanding that 'terrorist victims' holding judgments, as a group, must be first in line."  Pet. at 14 (quoting *Hausler v. JPMorgan Chase Bank, N.A.*, 845 F. Supp. 2d 553, 570 (S.D.N.Y. 2012), *rev'd and remanded*, 770 F.3d 207 (2d Cir. 2014)).  Being "first in line" with priority to obtain satisfaction of a judgment does not address the pertinent question of establishing a legal interest.  The TRIA does nothing to create a "superior" interest but

rather provides a vehicle for the attachment of assets possessed by designated terrorist (or narcotics kingpin) parties in aid of execution of a judgment. Thus, "TRIA allows petitioners to attach their judgment to property of certain designated parties; but absent execution or attachment, it does not confer an interest." *Sun*, 2025 WL 1591868, at *3. In this way, "[p]etitioners may, pursuant to TRIA, execute their judgment to blocked assets of the terrorist entities identified in that judgment which are otherwise subject to attachment[, b]ut TRIA does not 'guarantee that any blocked assets will in fact be available when a particular victim seeks to execute on a judgment, and TRIA does not guarantee that petitioners can attach their judgment here." *Id.* (citation omitted) (quoting *Smith ex rel. Est. of Smith v. Fed. Rsrv. Bank of N.Y.*, 346 F.3d 264, 271 (2d Cir. 2003)).

As to the issue of identifying the holder of a legal interest in the Forfeited Assets, petitioners are also unable to overcome the relation-back provision, expressly providing that "[a]ll right, title, and interest" in the Forfeited Assets "vests in the United States upon the commission of the act giving rise to forfeiture." 21 U.S.C. § 853(c). In this criminal case, the vesting of title in the United States occurred between November 2023 and November 2024, coinciding with the existence of the charged money laundering operation with which defendant stands convicted. Stip. Facts ¶ 4. A consequence of this relation-back provision is that generally "the government's interest will be superior to that of anyone whose interest does not antedate the crime." *United States v. Eldick*, 223 F. App'x 837, 840-41 (11th Cir. 2007). Petitioners' only interest that existed at the time of the offense is an unexecuted judgment against the Juárez Cartel, and "an *in personam* judgment . . . does not create any interest in particular property of the defendant." *United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 772 F. Supp. 2d. 205, 217 (D.D.C. 2011) (PLF). Consequently, petitioners cannot establish a superior right to the Forfeited Assets to avoid dismissal of the ancillary petition.

36

### 5.    *Petitioners' Other Arguments Are Unavailing*

Petitioners proceed to throw various arguments before the Court like spaghetti against a wall to see what sticks, but none are successful.  First, in four brief sentences, petitioners raise a constitutional challenge, contending that the Preliminary Order of Forfeiture, issued under the authority of criminal forfeiture statutes, cannot be held against them because "[i]t is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard."  Pet'rs' Opp'n at 10 (quoting *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n.7 (1979)).  The D.C. Circuit has determined that "[i]n order to make out a violation of due process, the plaintiff must show the Government deprived her of a 'liberty or property interest' to which she had a 'legitimate claim of entitlement,' and that 'the procedures attendant upon that deprivation were constitutionally [in]sufficient.'"  *Roberts v. United States*, 741 F.3d 152, 161 (D.C. Cir. 2014) (alteration in original) (quoting *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989)).  Petitioners have not specified precisely how the procedures provided in the criminal forfeiture statutes, particularly, 21 U.S.C. § 853(n), are constitutionally deficient, since they have had the opportunity to present their ancillary petition and their arguments in support of their claim.  Nor do petitioners grapple with the fact that every court of appeals to have considered a due process challenge to § 853(n) has upheld this statutory subsection.  *See United States v. 101 Houseco, LLC*, 22 F.4th 843, 851-52 (9th Cir. 2022); *United States v. Dong Dang Huynh*, 595 F. App'x 336, 340-41 (5th Cir. 2014); *United States v. McHan*, 345 F.3d 262, 269-70 (4th Cir. 2003).  The brief attention petitioners devote to this constitutional challenge does not convince otherwise.

Petitioners also lodge a somewhat murky improper delegation argument against the government's mere suggestion that they may find information about appropriate assets to attach by asking OFAC for identified assets.  *See* Gov't's Mot. at 26-28 (suggesting a "well-established

37

process" by which petitioners may be able to obtain satisfaction of the 2022 Judgment). From this suggestion, petitioners leap-frog to the conclusion that this is an effort "[t]o pigeon-hole American Victims, who Congress has armed with 'all the weapons available in civil litigation,'" Pet'rs' Opp'n at 19 (quoting 137 CONG. REC. S4511-04 (daily ed.) (statement of Sen. Charles Grassley in TRIA floor debate)), and that to do so "'without first determining the extent of their legal interest in the forfeited property would be an improper delegation of the Court's judicial authority to an executive agency, as well as an improper shirking of the obligation conferred on this Court by Congress' to adjudicate this Ancillary Proceeding," *id.* (quoting *United States v. Bailey*, 926 F. Supp. 2d 739, 773 (W.D.N.C. 2013) (rejecting government proposal to "[a]llow[] the Government to use the remission process [provided in 21 U.S.C. § 853(i)] in lieu of adjudicating the third-party petitions filed in this matter on their merits," in fraud case, which did not involve TRIA or blocked assets but disputed interests in criminal defendant's assets between petitioners who were defrauded and those who were not defrauded). Contrary to petitioners' contention, their claimed legal interest in the Forfeited Assets has been considered and rejected by this Court and, thus, Article III authority has not been improperly delegated to an executive agency.

Finally, petitioners highlight the government's position in the district court, after remand from *Levin II*, "that it no longer sought to quash the writs of attachment," which was interpreted by the court to be "a concession that the victim-plaintiffs have an interest in the funds subject to judicial forfeiture," and petitioners view that "[t]he government's concession signals the abandonment of its prior sovereign immunity and licensing arguments." AVCT's Not. of Suppl. Authority at 2, ECF No. 73 (citing *Estate of Levin v. Wells Fargo Bank, N.A.*, No. 21-cv-420 (JEB), 2026 WL 879176, at *10 (D.D.C. Mar. 31, 2026)). Even if petitioners' description of the government's position in another case were correct, petitioners' reliance on the government's

38

position there is misplaced.  The government's arguments and concessions in *Levin* were aimed at answering an entirely different question than presented here, namely, whether this Court was the appropriate venue for the *Levin* action and that analysis turned on "whether the [disputed] funds were in the government's possession, custody, or control" and "had nothing to do with . . . whether any party had a viable claim to the property."  Gov't's Resp. to Claimant's Supp., ECF No. 76.  Additionally, in *Levin*, on remand, the plaintiffs held an existing lien over the disputed funds, prompting the United States to "concede[] that the Victim-Plaintiffs have an interest in the Funds while maintaining its purportedly superior claim to them."  *Levin*, 2026 WL 879176, at *10.  Those are simply not the circumstances here.  Finally, to the extent petitioners rely on *Levin* to defeat the government's assertion of sovereign immunity and reliance on OFAC general licenses, the pending motion to dismiss the ancillary petition is resolved on grounds other than sovereign immunity or general OFAC licenses and thus those arguments are immaterial.

## IV.    CONCLUSION

For the foregoing reasons, the government's motion to dismiss the ancillary petition is granted.[11]    An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  April 29, 2026

                                                             _____
                                                             **BERYL A. HOWELL**
                                                             United States District Judge

---

[11]    As noted *supra* n.2, an apparently larger group of petitioners, but including the AVCT petitioners filing the ancillary petition in this criminal case, have filed a separate miscellaneous action, *Miller v. Juárez Cartel*, No. 23-mc-95 (BAH), with three pending, fully briefed motions, including petitioners' motion seeking an order to attach the Forfeited Assets.  Pls.' Mot. for Order Seeking On Notice Appl. for an Attach., ECF No. 3, *Miller*, No. 23-mc-95 (BAH).  The filing of an action to attach Forfeited Assets is expressly precluded by 21 U.S.C. § 853(k), and "[o]nce the Government has secured a stipulation as to forfeitability, third-party claimants can establish their entitlement to return of the assets only by means of the hearing afforded under 21 U.S.C. § 853(n)."  *Libretti*, 516 U.S. at 44.  Accordingly, petitioners' motion to attach the Forfeited Assets through a separate action will be denied, and the related motions will be denied as moot, *see* Jt. Mot. for Extension of Time, ECF No. 6, *Miller*, No. 23-mc-95 (BAH); U.S.'s Mot. to Intervene & Stay, ECF No. 7, *Miller*, No. 23-mc-95 (BAH).